OPINIONS OF THE SUPREME COURT OF OHIO
        The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
        Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Whitten, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
        NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


The State of Ohio, Appellee, v. Green, Appellant.
[Cite as State v. Green (1993),     Ohio St.3d    .]
Criminal law -- Aggravated murder -- Death penalty upheld, when.
      (No. 90-1673 -- Submitted January 5, 1993 -- Decided April
21, 1993.)
        Appeal from the Court of Appeals for Hamilton County, No.
C-880504.
        On January 4, 1988, defendant-appellant, Elizabeth Green,
visited her friend Belinda Coulter at her apartment and asked
if Coulter could help her sell food stamps so Green could buy
drugs.  Coulter went across the street to see the victim,
Thomas Willis, because he usually bought and sold food stamps.
He also sold "after-hours liquor" to his acquaintances.  On
Green's behalf, Coulter sold a forty-dollar book of stamps to
Willis for twenty-five dollars.  At Green's request, Coulter
then bought some cocaine on the street, which Green and Coulter
smoked.
        Over the next several hours, Coulter and Green returned to
Willis' apartment several times, either together or
separately.  They used various pretexts to gain entrance, such
as asking to use Willis' phone or seeking to sell him sex.
Some discussion involved a five-dollar stamp missing from the
food stamp book.  Before their last visit, a plan was
formulated to rob and kill Willis.
        Green and Coulter told conflicting versions as to what
occurred next.
        According to Coulter, Green came up with the idea to rob
Willis, and Coulter simply gave three dollars to Green to show
Willis that she wanted to buy some liquor.  Green then went
alone to Willis' apartment, taking socks for her hands to
prevent fingerprints from being left at the scene.  After a
long time, Coulter joined her.  When Coulter arrived, she heard
a noise like something falling and saw blood on the living room
floor.  Coulter went into the kitchen, and there "I screamed[,]
[a]nd then she [Green] was standing over him [Willis] with a
pillow over his face and there was blood everywhere."  Coulter
did not see Green go there with a knife, but she knew Green had
a knife "because we used it to cut cocaine that we had

smoked." Coulter asserted, "I didn't stab. I had nothing to do with killing that man at all."

On cross-examination, Coulter admitted she had talked to the police five times after the murder, that she originally denied knowing anything about the crime, and that she then made conflicting statements about the details of the robbery and murder. She was unsure of what she had told police. Coulter also admitted that Willis had previously given her clothes for her two children and had loaned her money.

In a pretrial statement given to police, Green asserts that it was Coulter who planned to rob and kill Willis because Coulter saw Willis with a lot of money when he paid her the twenty-five dollars for the food stamps. Both Coulter and Green went to Willis' apartment with children's socks on their hands. At the time of the murder, Coulter and Green told Willis they wanted to buy some liquor. Green followed Willis into the kitchen where he went to get the liquor. According to Green, Willis became suspicious, took out a knife, and said they were trying to rob him. Green grabbed for the knife, a struggle ensued, both Green and Willis wrestled on the floor, and Green's finger got cut. Willis got the knife and lunged at her, and Green retrieved the knife and "plunged" at him several times. While they were struggling, Green says she yelled for Coulter to come and assist her. Green claimed that Coulter also stuck the knife into Willis' legs. (There were no stab wounds in his legs.)

Green asserts that Coulter went through Willis' pockets and kept his money, except for $125 which she gave to Green. Before they left, they took a half pint of liquor. Back at Coulter's apartment, Green washed the blood out of her pants in the kitchen sink, and Coulter threw her clothing into the trash. In her pretrial statement, Green agreed she normally carried a knife, but she denied carrying a knife that day.

On January 4, 1988, around 7:00 p.m., James R. Cody, Coulter's live-in boyfriend and the father of her two children, arrived home from work and saw Green and Coulter smoking cocaine. He left around 9:30 p.m. When he came back an hour or so later, "things seemed suspicious." Green was wearing Coulter's clothes, and was washing her clothing in the kitchen sink. Cody asked them, "Who did you rob?" Neither Coulter nor Green responded. Later, Green asked Cody to buy some cocaine for her, but Cody refused. Green left the apartment around 12:30 a.m. in a taxicab.

On January 5, 1988, Sammy Gentry, who lived in the apartment below Willis', did not hear Willis upstairs and became concerned. Around 1:30 p.m., Gentry went into Willis' unlocked apartment, saw Willis on the kitchen floor, and called paramedics. Fire department personnel responded and found Willis dead; his body was very rigid, lying face up in a large pool of blood. The police were called.

Dr. Harry J. Bonnell, a forensic pathologist, examined Willis' body at the scene and supervised the autopsy. Willis, age sixty-eight, was five feet, eight and one-half inches tall, weighed one hundred thirteen pounds and was in poor health. He suffered from severe coronary artery disease, severe arteriosclerosis, and severe emphysema. Willis died as a result of "blood loss caused by multiple stab wounds and

incised wounds of his body."

Dr. Bonnell counted thirty-eight neck wounds, forty-six wounds to the torso, ten to the left arm, and fifteen on the right arm and hand. One neck wound involved a cut jugular vein, which also severed the nerve controlling the heart and breathing; another struck the side of the liver; one wound perforated the lung; and another could have collapsed a lung. However, many wounds were superficial cuts, some were difficult to distinguish as separate wounds, and some could have been exit wounds. Almost all the arm wounds could have been defensive wounds. The knife used was single edged, no more than one inch in width, and two and one-half to three inches in length.

Police investigators at the scene found a number of clues. A bloodstained pillow lay on the floor next to Willis' head, and a bloodstained child's sock also lay on the floor near the entrance to the apartment. In addition to a large quantity of blood on the kitchen floor, police also found a few blood stains on the living-room floor and on the bedspread in the bedroom. Some of the stains were blood type O, the same blood type as Willis'; but other stains were blood type B, the same as Green's.

Police also determined from a bloody shoeprint that the perpetrator wore a size seven or seven and one-half shoe, and that the shoe was probably a woman's shoe. A visitor to the apartment had smoked Salem cigarettes. Although Willis had been stabbed to death, police found no weapon at the scene.

Police investigation revealed that Willis, a retired city employee, cashed his retirement check for $514 on January 4, 1988. Police also established that Willis was very careful about whom he let into his apartment, allowing in only people he knew and trusted.

Police initially interviewed Coulter as a part of a neighborhood canvass, and eventually talked with her a total of five times. Police learned that Coulter had sold food stamps to Willis previously, that she wore a size seven shoe, and that she smoked Salem cigarettes. She had been seen recently with one one hundred dollar bill and two fifty dollar bills. Eventually, Coulter admitted she knew how Willis had died, and she told the police about Green's involvement in the murder.

The defense argued that Green was unable because of extensive drug and alcohol use to form the specific intent to kill Willis. Coley Turner, Green's ex-fiancee, testified that Green smoked marijuana and cocaine daily, took pills and drank heavily. Michael J. Ratto, a substance abuse and mental health counselor, determined that Green was chemically dependent on alcohol, marijuana, and cocaine. On the afternoon of the offense, Green had smoked five or six marijuana cigarettes, drunk four large shots of gin, and smoked crack cocaine. She would have had a blood-alcohol level of at least .162 that afternoon and possibly even .22.

Dr. Nancy Schmidtgoessling, a clinical psychologist, found that Green functioned intellectually in the bottom one percent of the population and had an IQ of 66. She termed Green grossly intellectually deficient except in simple everyday activities. Green also suffered from a deficit disorder since she was easily distracted by sounds. Green's problem-solving

ability was slow, rigid, and laborious, and she was unable to discern her feelings. Green's long-term marijuana and cocaine use together could have affected her thinking processes, memory and judgment. At the time of the offense, Green could have been suffering from an intense craving for more cocaine. The marijuana and alcohol she ingested caused her thinking to be less critical and impaired her concentration and memory, thereby affecting her behavior. Schmidtgoessling testified that Green "consistently told me that she only plunged [the knife] at him [Willis] maybe three times. That's what she told me each time." Green also said that Coulter went through Willis' pockets and took his money but later gave some to Green.

Coulter and Green were both indicted for aggravated murder and aggravated robbery. The death-penalty specification alleged that the murder occurred in the course of aggravated robbery, was committed with prior calculation and design, and both Coulter and Green were principal offenders. Coulter pled guilty to aggravated robbery and to involuntary manslaughter, was convicted of these crimes and later was subpoenaed to testify against Green. Before a panel of three judges, Green was tried and convicted, as charged, of aggravated robbery and aggravated murder.

## Sentencing Evidence

Thomas Green, the defendant's father, testified that Green had had a terrible childhood. When Green was three years old, her mother tried to kill her sister and her by tying them to chairs and setting their house on fire. Thomas took custody of Green and remarried. Her stepmother, Rosetta, and father had a rocky and violent relationship with excessive drinking and turbulence. At times, Rosetta would draw a knife on Thomas and almost killed him once. Thomas believed that Green's friend, Coulter, was a bad influence on Green.

Coley Turner, Green's former boyfriend, lived with Green for several years. Green was jealous, insecure, and had low self-esteem, and she remained too dependent on Turner when they were together. Green had serious problems with alcohol, marijuana, and cocaine. Lisa Green, Green's half-sister, affirmed the family's violent and turbulent history. Rosetta often forced Green to remove her clothing and beat her with a belt. In a rage, Thomas would throw furniture, and Rosetta would defend herself with a knife. Green tried to break up the weekly fights. At one time, Joseph Green, Green's half-brother, pulled a knife on Lisa, and Green tried to take it away from him. Thomas hated Green because she reminded him of her mother whom he hated. Green regularly carried a knife for protection. Joseph supported Lisa's testimony about the fights and turbulence in the family.

Linda Werner, a volunteer chaplain at the Justice Center where Green was incarcerated, conducted regular Bible studies and ministerial visits. She described Green as very quiet, reserved and grieving over the effect the murder would have on her family. Although inmates were often insincere, she found Green sincere, consistent in her conversations, and truthful. Gloria Ross, a former social worker, had helped Green about ten or eleven years previously when Green had been in a juvenile facility. Ross built a strong mother-daughter relationship with Green because Green's stepmother wanted nothing to do with

her.  Ross found Green to be "warm, affectionate, loving, and need[ing] a great deal of nurturing."  Green adjusted to this juvenile facility, and she spent most of her time there since her family would not accept her at home.  Green left the facility when she became pregnant.  Though she desperately wanted the baby, she suffered a miscarriage.  Ross was shocked that Green had committed any crimes.

Dr. Schmidtgoessling testified that Green showed no signs of schizophrenia, but that she was intense, preoccupied and hyperactive.  Green displayed a high level of distractibility and had deep dependency needs.  Green felt worthless because even her own mother had tried to kill her, and her father, an alcoholic, had beat her and constantly told her she was bizarre like her mother.  Ultimately, Green became the family scapegoat of her strongly dysfunctional family.  She only developed to the emotional level of a seven or eight-year-old and to the intellectual level of a ten to twelve-year-old.  Green suffered from "a personality disorder marked by dependency, avoidance and intense, often depressive, mood states."  Prior to incarceration, Green had been using marijuana and alcohol extensively for five or six years and cocaine for two years.  "At the time of the offense, her behavior and psychological functioning were most likely effected [sic] by her cognitive status, intoxicated state, and drive for more cocaine."

In an unsworn statement, Green said she was very sorry for this crime and asked forgiveness from the victim's family.  She had been taking drugs for nine years, but she now had a clear head since she had been in jail.  She was twenty-four years old, afraid to die, and asked that her life be spared.  She outlined the circumstances of the offense similar to those she described in her pretrial statement.  Coulter first suggested robbing Willis, but Green put socks on her hands at Coulter's urging.  Green claimed Willis pulled a knife because he suspected they were going to rob him.  Green and Willis wrestled, and Green managed to take the knife from Willis and "cut" him three or four times.

After the sentencing hearing, the three-judge panel sentenced Green to death and to a consecutive term of ten to twenty-five years for aggravated robbery.  The court of appeals affirmed the conviction and death penalty.1

Arthur M. Ney, Jr., Prosecuting Attorney, and William E. Breyer, Assistant Prosecuting Attorney, for appellee.
Timothy A. Smith and D. Shannon Smith, for appellant.

Francis E. Sweeney, Sr., J.
GUILT PHASE ISSUES
Cross-examination of Coaccused
In her Proposition of Law No. 1, Green argues that the three-judge panel erred in limiting the defense's cross-examination of Coulter.  After direct examination, Green's counsel cross-examined Coulter about the specifics of her pretrial statements to the police.  After a cross-examination three times longer than direct, the panel asked if the parties could stipulate that Coulter had made certain prior statements.  The parties so stipulated, and the prior statements were then admitted into evidence so the panel could

examine them for inconsistencies.

Cross-examination of a witness is a matter of right, but the "extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." Alford v. United States (1931), 282 U.S. 687, 691, 694, 51 S.Ct. 218, 219-220, 75 L.E. 624, 627, 629. The right of cross-examination includes the right to impeach a witness' credibility.

In this case, Green clearly had the right to impeach Coulter by cross-examining her about prior statements. However, the defense cross-examination on that point had become tedious and repetitive; counsel simply repeatedly asked if Coulter remembered making certain statements. No dispute existed that Coulter had made these prior statements, which were partially inconsistent with each other and with her in-court testimony. In fact, Coulter admitted she had told the police "a lot of different things" and that she had "lied" to them. These admissions rendered pointless any further questioning as to whether she had made the statements.

A trial judge has broad discretion "to preclude repetitive and unduly harassing interrogation[.]" Davis v. Alaska (1974), 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 353. As stated in Delaware v. Van Arsdall (1986), 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683, "trial judges retain wide latitude * * * to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

In this case, the trial panel acted within its discretion in finding the defense questioning tedious and repetitive, and suggesting that counsel stipulate the prior statements. Defense counsel attempted to impeach Coulter by questioning her about her plea bargain, and her refusal to speak to defense counsel. Further, defense counsel did cross-examine her about her prior statements. In fact, all the evidence of the prior inconsistent statements went to the panel for its consideration.

Additionally, the panel's suggestion of a stipulation did not prejudice Green. With the prior statements admitted, Green's counsel could freely point out and argue any inconsistencies that did exist. Moreover, Coulter's brief direct testimony did not provide the crucial evidence against Green. Green's own confession in which she admitted there was a plan to rob and kill Willis, and admitted stabbing him, together with other evidence constituted overwhelming evidence of guilt even without Coulter's testimony. Lack of an opportunity to fully cross-examine is harmless error when there is overwhelming, untainted evidence supporting a conviction. Harrington v. California (1969), 395 U.S. 250, 253-254, 89 S.Ct. 1726, 1728-1729, 23 L.Ed.2d 284, 287-288.

Most crucially, the panel's findings demonstrate the lack of prejudice because the panel rejected Coulter's version of the events. Coulter tried to minimize her participation in the murder to that of an accessory, mostly an accessory after-the-fact. However, the panel found both Green and Coulter to be principal offenders. Thus, Proposition of Law No. 1 is rejected.

### Ineffective Assistance of Counsel

In Proposition of Law No. 2, Green argues that her counsel's acceptance of the panel's suggestion of a stipulation covering Coulter's prior statements amounted to a denial of Green's right to the effective assistance of counsel. In addition, Green argues that her counsel made a grievous error by allowing the admission of Coulter's pretrial statements.

Reversal of a conviction or sentence based on the ineffective assistance of counsel requires satisfying the two-prong standard of Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Strickland requires (a) deficient performance--"errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (b) prejudice--"errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

However, defense counsel's decision to allow the prior statements into evidence instead of further cross-examining Coulter was a reasonable tactical decision. Since the prior statements were admitted into evidence, counsel could freely argue all inconsistencies without a further belabored cross-examination. The tactical decision to agree to the stipulation fell "within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. Thus, counsel did not perform deficiently.

Green also failed to satisfy the second Strickland requirement of prejudice. No reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Coulter's testimony was not crucial; Green's conviction rested upon other compelling, convincing evidence of guilt, which included her confession. Also, the panel essentially accepted Green's version and found Coulter equally responsible for the robbery and murder. Moreover, no evidence exists that the court considered Coulter's pretrial statements other than to compare inconsistencies. The three-judge panel must be presumed not to have improperly used these statements. See State v. White (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 136, 239 N.E.2d 65, 70, quoted in State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759. Thus, Proposition of Law No. 2 lacks merit.

### SENTENCING PHASE ISSUES
### Circumstances of Offense

In Proposition of Law No. 3, Green argues the trial panel's sentencing decision failed to specify the aggravating circumstance and improperly relied upon the nature and circumstances of the offense as aggravating circumstances. Admittedly, the panel's opinion inaccurately asserted: "The nature and circumstances of this savage act far outweigh any mitigating factors."

However, perusal of the entire panel opinion demonstrates that the panel correctly identified the aggravating circumstance to be that the aggravated murder occurred in the course of an aggravated robbery. When a trial court correctly identifies a statutory aggravating circumstance, "this court

will infer that the trial court 'understood the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense.'" State v. Wiles (1991), 59 Ohio St.3d 71, 90, 571 N.E.2d 97, 120, quoting State v. Sowell (1988), 39 Ohio St.3d 322, 328, 530 N.E.2d 1294, 1302. Moreover, the panel correctly evaluated the nature and circumstances of the offense when it stated, "there was nothing mitigating about the nature and circumstances of the offense. This was a brutal, purposeful, cold and calculated act that culminated in [aggravated murder]."

Thus, the trial panel did not err. In fact, a trial court or three-judge panel "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." State v. Stumpf (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus. See, also, State v. Steffen (1987), 31 Ohio St.3d 111, 117, 31 OBR 273, 278, 509 N.E.2d 383, 390. State v. Davis (1988), 38 Ohio St.3d 361, 528 N.E.2d 925, is distinguishable, since the trial panel in that case improperly delineated four circumstances surrounding the offense as specific aggravating circumstances.

Additionally, this court's independent assessment of the sentence would cure any deficiency in the trial panel's sentencing decision. See Clemons v. Mississippi (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725; State v. Landrum (1990), 53 Ohio St.3d 107, 124, 559 N.E.2d 710, 729; State v. Lott (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304. Thus, Proposition of Law No. 3 lacks merit.

Disparity of Sentences

In Proposition of Law No. 4, Green argues the court of appeals erred by not finding the disparity of treatment between Coulter and Green to be a mitigating factor. Pursuant to guilty pleas, it is undisputed that Coulter was sentenced to seven to twenty-five years for involuntary manslaughter and to five to twenty-five years for aggravated robbery, the sentences to run consecutively. Green argues that since the trial panel found the sentence disparity to be a mitigating factor, the court of appeals is equally required to find that disparity to be a mitigating factor.

The state responds to Green's argument by asserting waiver. But waiver is inapplicable here. Green cannot be expected to raise, in advance, an issue about the court of appeals' sentencing decision before that court issues its decision.

Nonetheless, Green's argument that the court of appeals erred lacks merit. R.C. 2929.05(A) contemplates a separate and independent assessment of the sentence. See State v. Maurer (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph four of the syllabus. Neither the court of appeals nor this court need be bound by a lower court's opinion as to whether a factor is mitigating. If a higher court were so bound, the review would not be independent. In fact, R.C. 2929.05(A) specifies that:

"The court of appeals and the supreme court * * * shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating

circumstances * * * outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." (Emphasis added.)

In a comparable situation, this court has recognized that the individual weighing of mitigating factors is a matter within a decision-maker's discretion. R.C. 2929.04(B) requires the court to consider an offender's history, background and character, but the court need not give mitigating weight to that factor if it finds it not mitigating. State v. Stumpf, supra, at paragraph two of the syllabus. See State v. Steffen, supra, at paragraph two of the syllabus ("* * * The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight.").

Moreover, this court's independent sentence assessment would cure any defect in the court of appeals' sentencing decision. State v. Lott, supra; State v. Landrum, supra. The question as to what weight, if any, should be given to the sentence disparity will be addressed in the independent sentence assessment. Proposition of Law No. 4 is rejected.

### Proportionality Review

In Proposition of Law No. 5, Green argues that her death sentence must be set aside, pursuant to the statutory proportionality review, because of the disparity between her sentence and Coulter's sentence.

We have held that "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." State v. Steffen, supra, at paragraph one of the syllabus. See State v. Stumpf, supra, at 107, 512 N.E.2d at 610.

Additionally, we have ruled that disparity of sentence does not justify reversal of a death sentence when the sentence is neither illegal nor an abuse of discretion. State v. Jamison (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188. Proposition of Law No. 5 lacks merit.

### Significance of Mitigation

In Proposition of Law No. 6, Green argues that the state failed to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors. Green points out that she had a horrible life and that she is mentally and emotionally retarded. She argues: "Willis was killed by a mentally retarded, emotionally disturbed, doped-up child, who was induced to commit the crime by her drug supplier, who received a 7-25 year sentence as payment for her testimony."

Green cites no legal authority as to why the aggravating circumstance does not outweigh the mitigating factors, so this issue will be examined in the context of the court's independent sentence review. Proposition of Law No. 6 is rejected.

### Constitutionality of Death-Penalty Statute

In Proposition of Law No. 7, Green argues that Ohio's death-penalty statute is unconstitutional because it fails to provide for adequate appellate review. Specifically, she contends a proper proportionality review should encompass not only cases where the death penalty was sought but also cases where the death penalty was not sought but could have been sought. Although Green raised this issue in the court of

appeals, she did not raise the issue at trial. See State v. Awan (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus. Moreover, the current system of appellate review has been ruled constitutional. State v. Steffen, supra, at 122-124, 31 OBR at 283-284, 509 N.E.2d at 394-395; State v. Jenkins (1984), 15 Ohio St.3d 164, 209, 15 OBR 311, 350, 473 N.E.2d 264, 304. This proposition of law is overruled.

In Proposition of Law No. 8, Green further challenges the constitutionality of Ohio's death-penalty statute. However, Green neither argues nor provides authority for her challenges. Green also waived these issues by not raising them before the trial court. State v. Awan, supra. Additionally, this court has consistently upheld the statute's constitutionality. State v. Buell (1986), 22 Ohio St.3d 124, 136, 22 OBR 203, 213, 489 N.E.2d 795, 806; State v. Jenkins, supra. Summary disposal is appropriate. State v. Poindexter (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. Proposition of Law No. 8 lacks merit.

INDEPENDENT SENTENCE ASSESSMENT

Pursuant to our duties imposed by R.C. 2929.05(A), we now independently review the death-penalty sentence for appropriateness and proportionality.

The evidence establishes beyond a reasonable doubt the aggravating circumstance that Green killed Willis during an aggravated robbery and that she was a principal actor in the murder. Because Green and Coulter planned to rob and kill Willis, which is evidenced by the fact that the victim knew Green and Coulter and both perpetrators put socks on their hands to prevent fingerprints at the scene, the trial panel reasonably found prior calculation and design.

The nature and circumstances of the offense provide few mitigating features. Green and Coulter planned and carried out the deliberate and calculated robbery and murder of an elderly, frail, citizen in his own home. Their motive was simply a desire for more money to buy cocaine. Even assuming that Willis pulled a knife when he suspected a robbery, that fact would scarcely be mitigating. A citizen's choice to defend himself against an unlawful assault does not lessen the moral culpability of the assault. See State v. Clark (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844, 856. However, the cut that Green suffered on her hand in that initial struggle with Willis probably explains the frenzy of her ensuing attack.

Green's "history, character, and background" do provide mitigating features. Green suffered a terrible childhood: her mother tried to kill her when she was three years old, her alcoholic father beat her frequently, and her stepmother neither loved nor nurtured her. Family fights in which her stepmother pulled a knife to defend herself were frequent. Green became the family scapegoat, and at age thirteen or fourteen, she went into a juvenile facility. At age fifteen, she became pregnant and suffered a miscarriage. Ultimately, she transferred her deep dependency needs from her boyfriend, Turner, and social worker, Ross, to drugs and alcohol. The evidence clearly established she was chemically dependent on marijuana, cocaine, and alcohol and had been so dependent for years. With an IQ of 66, she functioned only very marginally. Dr. Schmidtgoessling described Green as intellectually "ten,

eleven, twelve; emotionally, much younger than that, more like seven or eight."

In our review of any statutory mitigating factors, Willis arguably "induced or facilitated" the offense because he illegally bought food stamps and sold liquor. See R.C. 2929.04(B)(1). However, even if true, no significant mitigating weight need be assigned to this factor. The moral culpability of a murder is not lessened because the frail, elderly victim operated on the fringe of the law. Green did not act under "duress, coercion, or strong provocation," within the meaning of R.C. 2929.04(B)(2). While Green may have been shocked by the cut on her hand, she brought that upon herself with her plan to rob and kill Willis. Since Green was a principal actor in the offense, R.C. 2929.04(B)(6) is inapplicable.

Green's very limited intelligence, an IQ of 66, would qualify as a mental defect within R.C. 2929.04(B)(3), although she suffered no mental disease. However, evidence is lacking that her mental defect caused Green to lack "substantial capacity to appreciate the criminality" of her conduct or conform that conduct to law. Nonetheless, Green's limited intelligence would be a mitigating "other factor" under R.C. 2929.04(B)(7). Green's age of twenty-four only nominally satisfies the mitigating factor of "youth of the offender," R.C. 2929.04(B)(4), and is entitled to only slight weight.

As to R.C. 2929.04(B)(5), the trial panel found, as a fact, that Green had three prior adjudications as a juvenile and four adult misdemeanor convictions. The court of appeals agreed that Green's "history of criminal convictions and delinquency adjudications, does not weigh in Green's favor because she has previously been convicted of several criminal acts, including theft, drug abuse and resisting arrest." This finding apparently rests upon a presentence investigation not forwarded as a part of the record of trial. Since Green does not claim the absence of a criminal record, as a mitigating factor, the absence of formal documentation of her record can be considered as harmless error. R.C. 2929.04(B)(5) is thus not applicable.

Under R.C. 2929.04(B)(7), as mitigating "other factors," we consider the different treatment accorded to Coulter, Green's remorse, the circumstances of her upbringing, her alcoholism and drug addiction, and her limited intelligence.

Coulter was convicted and sentenced for involuntary manslaughter and aggravated robbery. We determine the possible significance of this mitigating factor is diminished because Coulter pled guilty and Green stabbed the victim.

In weighing the aggravating circumstance against mitigating factors, we find that the aggravating circumstance does outweigh the mitigating factors beyond a reasonable doubt. Collectively, Green's lack of intelligence, family upbringing, and alcohol and drug addiction are entitled to modest weight. In contrast, Green planned and carried out a calculated robbery and murder of a frail, elderly man in his own home. The number and manner of the stab wounds convincingly demonstrate an intention to commit murder. The manner of death and the prior calculation and design tend to negate Green's later claims of remorse.

The death penalty in this case is neither excessive nor disproportionate, but is appropriate, when compared with other felony-murder cases. See State v. Smith (1991), 61 Ohio St.3d 284, 574 N.E.2d 510; State v. Wiles, supra; State v. Jackson (1991), 57 Ohio St.3d 29, 565 N.E.2d 549; State v. Landrum, supra; State v. Lott, supra; State v. Johnson (1989), 46 Ohio St.3d 96, 545 N.E.2d 636; State v. Van Hook (1988), 39 Ohio St.3d 256, 530 N.E.2d 883; State v. Greer (1988), 39 Ohio St.3d 236, 530 N.E.2d 382; State v. Holloway (1988), 38 Ohio St.3d 239, 527 N.E.2d 831.

Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

Moyer, C.J., A.W. Sweeney, Douglas and Resnick, JJ., concur.

Wright, J., concurs separately.

Pfeifer, J., dissents.

FOOTNOTE:

1 In January 1991, the Governor of Ohio commuted Green's death sentence to life imprisonment. However, in Wilson v. Maurer, case No. 91 CVH01-763, the Franklin County Court of Common Pleas set aside that commutation. An appeal in that case is now pending before the Franklin County Court of Appeals. In State ex rel. Maurer v. Sheward, case No. 92-1350, the sentenced defendants filed a prohibition action in the court of appeals asserting that the trial judge lacked jurisdiction to consider the Governor's commutation. That case is now on appeal here. See, also, State ex rel. Ney v. Governor (1991), 58 Ohio St.3d 602, 567 N.E.2d 986. We express no judgment as to the merits of the underlying commutation case or case No. 92-1350 by our decision today.

Wright, J., concurring. While I concur without reservation with the vast majority of the court's opinion, I write briefly to articulate my position on the weight of the mitigating factors presented by Green.

Justice Sweeney fully and accurately discusses Green's extremely low intelligence, her advanced alcoholism and drug addiction, and her limited intellectual and emotional development. I disagree, however, with the conclusion that these factors are entitled only to "modest weight." I believe that together they carry considerable weight.

Although in past cases the existence of such factors has led me to dissent from the imposition of the death penalty,2 the aggravating circumstance present in this case is very strong; in my view it outweighs the mitigating factors beyond a reasonable doubt. The evidence showed that Green and Coulter coldly formulated a plan to rob and kill an elderly victim in his home and that Green carried the plan into action. In a case in which an offender committed a premeditated felony murder, evidence of low intellect, advanced chemical dependency, and limited emotional development should not be sufficient to warrant vacating the death penalty on appeal.

However, in a different case -- one that does not involve prior calculation and design -- these same strong mitigating factors could lead me to vote to vacate the death penalty

pursuant to R.C. 2929.05.  In short, I respectfully disagree
with the majority's allotment of only "modest weight" to these
factors.

FOOTNOTE:

     2  See, e.g., State v. Slagle (1992), 65 Ohio St.3d 597,
615, 605 N.E.2d 916, 932 (Wright, J., dissenting); State v.
Rogers (1985), 17 Ohio St.3d 174, 188, 17 OBR 414, 426, 478
N.E.2d 984, 997 (Wright, J., dissenting).

     Pfeifer, J., dissenting.  I dissent from the majority's
decision to uphold Elizabeth Green's death sentence.  This
court's statutorily mandated proportionality review should
include a consideration of the disproportionate sentence given
to her co-defendant, Belinda Coulter.  Also, the aggravating
circumstance of Green's crime fails to outweigh the mitigating
factors present in this case.
                               I
     The trial panel in this case stated in its opinion that
Belinda Coulter "also was a principal offender and both Green
and Coulter actively participated in the offense and the acts
that led to the death of Thomas Willis."  The panel determined
that "both Green and Coulter [were] equally responsible for the
Aggravated Murder and Aggravated Robbery of Thomas Willis
* * *."  While there is some question in the record as to
whether Coulter inflicted any stab wounds, the record does show
that she planned the murder of Willis with prior calculation
and design.
     According to the evidence in the record, including Green's
confession and Coulter's statements to police, it was Coulter
who had the ongoing relationship with Willis.  Coulter was the
intermediary in Green's sale of her food stamps to Willis.  It
was Coulter who noticed that he was carrying a large amount of
cash on the day of the murder.  It was she who had already
spent $100 that day on cocaine, and it was she who craved
more.  It was she who engineered the women's entry into Willis'
home, asking Willis to sell her some liquor.  She, too, was
wearing socks on her hands to avoid leaving fingerprints.  She
took Willis' wallet.  She ended up with about two-thirds of the
stolen cash.  She disposed of what she thought was  evidence of
the crime.  One of the socks she wore on her hands was found
bloody at the murder scene.
     However, Coulter pleaded guilty to a reduced charge of one
count of involuntary manslaughter and one count of aggravated
robbery.  Her combined sentence was for a period of twelve to
fifty years.
     In reviewing a death sentence, we are required by R.C.
2929.05(A) to "consider whether the sentence is excessive or
disproportionate to the penalty imposed in similar cases."
This court has resisted considering a co-defendant's sentence
in its proportionality review.  State v. Stumpf (1987), 32 Ohio
St. 3d 95, 108, 512 N.E.2d 598, 611.  However, the statute does
not prohibit such a consideration, and a logical reading of the
statute requires it.
     The obvious purpose of the statute's proportionality
language is to ensure that a death sentence is fair in

comparison to the penalty received by other persons committing like crimes. In most cases, there are not two principals involved in a particular crime, and it thus becomes necessary to look at how the death penalty has been applied in cases with similar facts.

Proportionality is most accurately determined when comparing the sentences of two persons involved in the same crime. No other case could be more similar, or more relevant. R.C. 2929.05(A) has little meaning if the defendant's sentence cannot be compared to the most relevant sentence possible -- that of her co-defendant.

In this case, Green's sentence is astonishingly disproportionate to the sentence received by Coulter. Granted, the sentence imposed upon Coulter was for nominally different crimes than those with which Green was charged, but both sentences arose from the same set of operative facts and are based upon acts for which the trier of fact found Green and Coulter equally responsible. The only difference between the two is that Coulter was able to plea bargain. The effect of that plea bargain was negligible given Green's own confession.

While plea bargains may be a necessary evil, prosecutors should avoid situations where a plea bargain will result in the death penalty for one defendant, as opposed to a greatly reduced charge for another principal in the same crime. This state's statutory safeguards require that the death penalty not be arbitrarily administered.

In this case, the prosecutor determined who was to live and who was to die. That result is disquieting given the General Assembly's attempt to ensure proportional administration of capital punishment.

The plain reading of R.C. 2929.05(A) requires that proportionality review include the sentences of co-defendants. In this case, Green's death sentence should be overturned. It is clearly disproportionate to Coulter's reduced charge and twelve-to-fifty-year combined sentence.

II

If Coulter's sentence is not considered in this court's proportionality review, it should at least be considered as a strong mitigating factor. Another strong mitigating factor is the fact that the victim in this case basically had a welcome mat out for attack. Willis was a known illegal dealer in food stamps and also sold liquor out of his home. He was involved in criminal activity and invited the risk of meeting a violent end.

These mitigating factors, together with Green's extraordinarily low IQ, relatively young age, chemical dependency, and terrible childhood and adolescence, are not outweighed by the aggravating circumstance present in this case. For that reason as well, Green's death sentence should be vacated.