[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 399.]

THE STATE OF OHIO, APPELLEE, *v*. BURKE, APPELLANT.

[Cite as *State v. Burke*, 1995-Ohio-290.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-498—Submitted April 4, 1995—Decided August 30, 1995.)

APPEAL from the Court of Appeals for Franklin County, No. 90AP-1344.

———————————

{¶ 1} On the evening of November 22, 1989, defendant-appellant, Mark Burke, along with his cousin James Tanner, Jr., attended the anniversary party of Tanner's sister, Terri Newby. While at the party, Burke and Tanner got into a fight with one of Newby's neighbors, Lawrence Smith. During the fight, Smith hit Burke in the face with a crowbar. At approximately 11:22 p.m., in an attempt to break up the fight, one of the guests called 911. Tanner and Burke grabbed Smith's leather jacket and left the party.

{¶ 2} The two men decided to borrow a gun so that they could return to the party to scare Smith. First, they went to Burke's father's house. David Burke, Sr. cleansed Burke's wound but told his son that he did not have a gun. Fifteen or twenty minutes later, the men left and went to Billy McBride's house, who was seventy-two years old. Burke had previously worked with McBride and had lived with him for three to four weeks when he had had domestic problems with Yvette Wilks, the woman he lived with.

{¶ 3} Shortly after midnight, Janaia Prysock, who lived next door to McBride, heard moans coming from the direction of McBride's house. Prysock went downstairs and told her mother that "Mr. Bill" was moaning. As she looked out the window, she observed Burke, whom she recognized as having visited McBride on previous occasions, come out onto McBride's back porch and then reenter McBride's house. Both she and her mother, Bertha Bryant, then saw

another man, who was wearing a leather jacket, come out of the house clutching a knife. The man ran to the side of the house. Bryant called the police. The two men then ran to their car, which was parked in the driveway. Bryant and her daughter noticed that Burke had blood on his hands and clothes. Burke, who was driving the car, backed out of the driveway and hit a rock. The two men then went to Burke's father's house, where they were overheard talking about murder.

{¶ 4} Officers from the Columbus Police Department arrived at the scene at 1:25 a.m. and discovered McBride's body at the side of the house. Upon finding no pulse, they notified the homicide department and the Crime Scene Search Unit. Officers roped off the front yard and found two bent, bloodstained steak knives. The police also discovered that all three floors of McBride's home had been completely ransacked and looked like it had been purposely vandalized. Further investigation revealed that a microwave, a checkbook, a watch and other jewelry were missing from the home. Fingerprints were lifted from the crime scene but could not be identified as belonging to Burke or Tanner. Nor was there a sufficient amount of blood to analyze it and match it to Tanner or Burke by blood type.

{¶ 5} Later that morning, at around 10:30 a.m., Tanner and Burke went to Tanner's sister's home. They had just come from the emergency room, where Burke had received stitches as a result of being hit with the crowbar. Tanner's sister, Michelle, and her husband overhead the two men, who were sitting in the kitchen drinking beer, singing a song about going to Lucasville. Tanner also told another sister that they had killed somebody.

{¶ 6} In the afternoon, James Tanner, Sr. called the police and told them that his son, James Tanner, Jr., and nephew, Mark Burke, were responsible for the murder of McBride. After further investigation, the police apprehended both men. Tanner, who was arrested at a friend's house, was found with McBride's checkbook, watch and gold chains. The police arrived at Burke's home at 1:45 a.m. on November 24, 1989. Upon searching the apartment, police discovered a

microwave, later identified as belonging to McBride, hidden in the utility closet. In addition, police found two large knives and a gray sweatshirt inside the dumpster near the apartment. The clothes Burke had been wearing at the time of the murder had been washed.

{¶ 7} Burke volunteered a tape-recorded statement to the police at the time of his arrest. He admitted going to McBride's house with Tanner but denied stabbing McBride. Later that day, Burke was interviewed a second time on videotape at police headquarters. Although much of the conversation on the videotape is inaudible, Burke maintained that it was Tanner who had stabbed McBride and that he played no role in the stabbing.

{¶ 8} Dr. Keith Norton, a Deputy Franklin County Coroner, performed an autopsy on McBride. The autopsy revealed that McBride was stabbed twelve times, with one of thirteen wounds being an exit wound. Five of the wounds showed evidence of healing, which indicated that they had been inflicted at least one hour before McBride's death. Norton stated that his autopsy results were consistent with a time of death of 1:30 a.m. on November 23, 1989 and that McBride's death was caused by an irregular beating of the heart as a result of all of the stab wounds. He further believed that the healing wounds could have been caused by someone prodding the victim with a knife.

{¶ 9} Burke was indicted by the Franklin County Grand Jury on one count of aggravated robbery and two counts of aggravated murder, each containing two specifications: (1) that the offense was committed to escape detection for aggravated robbery (R.C. 2929.04[A][3]), and (2) that the aggravated murder was committed in connection with the aggravated robbery and Burke was either the principal offender or committed the aggravated murder with prior calculation and design (R.C. 2929.04[A][7]). At the jury trial, Burke testified in his own behalf. Burke again denied stabbing McBride and instead blamed Tanner for killing McBride. At the conclusion of the case, the jury found Burke guilty on all counts

and on the first specification to both counts of murder. The jury returned two verdict forms finding Burke guilty on the second specification to Count One, and returned no verdict on the second specification to Count Two.

{¶ 10} At the sentencing hearing, several family members testified that Burke's mother was an alcoholic who deserted the family when Burke was young and that Burke and his siblings were often left alone and essentially "raised themselves." Burke repeated the seventh grade and was absent from school repeatedly.

{¶ 11} Dr. James Reardon, a psychologist, described Burke's upbringing as chaotic and stated that Burke began abusing alcohol at an early age. Psychological testing revealed, in Reardon's opinion, that Burke suffers from emotional distress and has a "borderline personality disorder." Further, Burke's I.Q. score places him within the lowest six percent of the population and is within the borderline mentally retarded range of functioning loss.

{¶ 12} Burke called James Tanner as a witness, but Tanner, who was also indicted and awaiting a separate trial, invoked his right against self-incrimination. Defense counsel waived closing argument and the trial court instructed the jury on mitigating factors (6) and (7) of R.C. 2929.04(B).

{¶ 13} The jury recommended the death penalty on both aggravated murder counts. Burke asked that sentencing be postponed until after Tanner's capital trial was resolved. The court denied this request, merged the aggravated murder counts for purpose of sentencing, and sentenced Burke to death on count one of the indictment. The court also sentenced Burke to a term of imprisonment for his aggravated robbery conviction.

{¶ 14} The Tenth District Court of Appeals affirmed the convictions and sentence of death. One judge dissented on the death sentence on the ground that, from a proportionality standpoint, Burke should not receive the death penalty, since Tanner was subsequently sentenced to life imprisonment.

**{¶ 15}** The matter is now before this court as a matter of right.

_____

*Michael Miller*, Franklin County Prosecuting Attorney, and *Joyce S. Anderson*, Assistant Prosecuting Attorney, for appellee.

*David J. Graeff*, for appellant.

_____

**FRANCIS E. SWEENEY, SR., J.**

**{¶ 16}** Burke raises twenty-one propositions of law which we have fully reviewed and considered. (See Appendix.) However, in light of our recent decisions, we do not address each one in opinion form. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 3, 520 N.E.2d 508, 570; *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; *State v. Simko* (1994), 71 Ohio St.3d 483, 487, 644 N.E.2d 345, 350. We have also independently assessed the evidence relating to the death sentence, independently balanced the aggravating circumstances against the mitigating factors, and reviewed the proportionality of the sentence to sentences imposed in similar cases. We hereby affirm the convictions and sentence of death.

I

GUILT PHASE

Statements by Accomplice

**{¶ 17}** In the second proposition of law, appellant contends that the trial court erred in disallowing relevant hearsay statements made by Tanner concerning the murder. According to appellant, these statements were admissible under Evid.R. 804(B)(3) as declarations against penal interest.

**{¶ 18}** In order for Evid.R. 804 hearsay exceptions to apply, the declarant must be deemed unavailable. Although Tanner invoked his right against self-incrimination at the sentencing hearing, Tanner was not called as a witness during the guilt phase and cannot be said to have been unavailable during that phase. Thus, Tanner's statements were properly excluded.

{¶ 19} Appellant's reliance on *State v. Landrum* (1990), 53 Ohio St.3d 107, 113, 559 N.E.2d 710, 719, is misplaced, since in that case the witness was deemed unavailable at the sentencing hearing because at that hearing he invoked his privilege against self-incrimination. Further, even in *Landrum*, *supra*, at 115, 559 N.E.2d 721, where this court found that the exclusion of hearsay statements was erroneous, we did not find it prejudicial error in view of our independent assessment and reweighing of the evidence. Appellant's second proposition of law is without merit.

Confrontation Rights

{¶ 20} In the fourth proposition of law, appellant argues that he was denied his right to due process under *Brady v. Maryland* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215, 218, and was denied his Sixth Amendment right to confrontation as a result of the police losing the tape recorded statement of state witness Janaia Prysock.

{¶ 21} In *Arizona v. Youngblood* (1988), 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289, the United States Supreme Court stressed that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Appellant fails to show bad faith on the part of police. Since there is no evidence that the police deliberately lost, concealed or destroyed the tape, appellant's due process rights were not violated.

{¶ 22} Further, the state produced a summary of the interview and Prysock testified at trial. Thus, appellant had the opportunity "to be confronted with the witnesses against him" as guaranteed by the Sixth Amendment. In fact, defense counsel took advantage of this right by questioning this witness as to any inconsistencies between the summary and her testimony on direct examination. For these reasons, appellant's fourth proposition of law is without merit.

Manifest Weight of the Evidence

**{¶ 23}** In the fifth proposition of law, appellant contends that the guilty verdict is against the manifest weight of the evidence. Appellant argues that the evidence does not demonstrate that the victim died directly from stab wounds, and, further, since there was no evidence to prove specific intent or purpose to kill, the killing constitutes involuntary manslaughter, not aggravated murder.

**{¶ 24}** However, there was testimony that McBride died as a result of being stabbed. The deputy coroner clearly stated that the victim's death was caused by an irregular beating of the heart as a result of all of the stab wounds to his body. Thus, the twelve stab wounds suffered by the victim collectively resulted in his heart failure and death.

**{¶ 25}** We likewise reject appellant's contention that there was insufficient evidence to support a finding that he acted with a purpose to kill. Intent need not be proven by direct testimony. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555 N.E.2d 293, 302. Instead, an intent to kill "may be deduced from the surrounding circumstances, including the instrument used, its tendency to destroy life if designed for that purpose, and the manner of inflicting the wound." *State v. Robinson* (1954), 161 Ohio St. 213, 218-219, 53 O.O. 96, 99, 118 N.E.2d 517, 521.

**{¶ 26}** In this case, there was evidence that the victim was stabbed twelve times and five of the wounds showed evidence of healing consistent with someone prodding the victim with a knife an hour before the last wounds were inflicted. There was also direct testimony by state witnesses that appellant's hands and clothing were covered with blood as he left the victim's house. Although appellant testified that he and Tanner were at McBride's house for only ten or twenty minutes, the ransacking of the house suggests otherwise. Also, appellant's contention that McBride was stabbed only outside the house, by Tanner, is contrary to the deputy coroner's testimony concerning the healing wounds found on the victim's body. Obviously, the trier of fact weighed this conflicting evidence and assessed the credibility of witnesses in finding appellant guilty as charged. *State v. DeHass*

(1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. We believe there was sufficient evidence presented on which to convict appellant of aggravated murder.

Effective Assistance of Counsel

{¶ 27} In the twentieth proposition of law, appellant cites ten instances of alleged ineffective assistance of counsel during the guilt phase. In the sixth proposition of law, appellant claims that defense counsel's waiver of closing argument at the mitigation phase also constituted ineffective assistance of counsel.

{¶ 28} Reversal of a conviction on the grounds of ineffective assistance of counsel "requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, paragraph two of the syllabus. None of the instances raised by appellant demonstrates prejudice or that defense counsel's performance was so deficient that there is a reasonable probability that if it were not for these errors, the result would have been different. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

{¶ 29} As to defense counsel's waiver of closing argument at the mitigation hearing, we find that this may have simply been a tactical decision made by defense counsel to prevent the state from splitting closing argument and staging a strong rebuttal. (See *State v. Apanovitch* [1987], 33 Ohio St.3d 19, 24-25, 514 N.E.2d 394, 400-401.) We do not find that appellant has proven his claim of ineffective assistance of counsel. Consequently, we reject appellant's sixth and twentieth propositions of law.

Jury Instructions

{¶ 30} In the seventh and ninth propositions of law, appellant contends that the trial court erred in failing to delete "prior calculation and design" from the specification language contained in R.C. 2929.04(A)(7) in its instructions to the

jury at both the guilt and sentencing phases, and in relying on prior calculation and design in sentencing. Although it is improper for a jury to consider prior calculation and design and principal offender status as separate aggravating circumstances (*State v. Penix* [1987], 32 Ohio St.3d 369, 513 N.E.2d 744), we have recently held that a trial court may instruct the jury on prior calculation and design and principal offender status disjunctively in the same specification, as the court did here. *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 82-83. However, the court erred in not instructing the jurors that they must be unanimous in agreeing on which of the alternatives Burke was guilty of. *State v. Johnson* (1989), 46 Ohio St.3d 96, 104-105, 545 N.E.2d 636, 644-645. We find the error harmless, since the guilty verdict on Count One of the indictment already showed unanimous agreement that Burke committed the murder with prior calculation and design.

{¶ 31} Nor do we find error in the court's charge on voluntary manslaughter, as appellant contends in the eighteenth proposition of law. Since there was no evidence that the victim provoked appellant, the court did not err in refusing to instruct the jury on provocation. See *State v. Lawrence* (1989), 44 Ohio St.3d 24, 26, 541 N.E.2d 451, 454. Further, defense counsel failed to object to these instructions. Consequently, we overrule these propositions of law.

Voluntariness of Police Interview

{¶ 32} In his twelfth proposition of law, appellant contends that his videotaped statement to police was involuntary and that the trial court erred in admitting this tape into evidence and in allowing it to be played for rebuttal purposes to the jury.

{¶ 33} Defense counsel has waived all but plain error by failing to object to the admissibility of the tape. *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367. Although the tape reveals that police failed to advise appellant of one of the consequences of waiving his *Miranda* rights (specifically, that his statements could be used against him in a court of law), the

admission of the tape was harmless and did not affect the outcome of the trial. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 34} Nor was appellant coerced into making a statement to police. While police made some false statements to appellant during the interrogation, this does not necessarily make his statements involuntary. *State v. Cooey* (1989), 46 Ohio St.3d 20, 27, 544 N.E.2d 895, 906-907. In fact, we find that despite these misrepresentations, "defendant's will to resist was not overborne by threats or improper inducements." *State v. Melchior* (1978), 56 Ohio St.2d 15, 25, 10 O.O.3d 8, 14, 381 N.E.2d 195, 202. Moreover, the trial judge specifically cautioned the jury that the videotape contained statements that were not testified to by any witness in the case and that it was only to be considered for the limited purpose of determining appellant's credibility. Appellant's twelfth proposition of law is without merit.

II

PENALTY PHASE

Recorded Statement of Tanner

{¶ 35} In the third proposition of law, appellant argues that the trial court committed prejudicial error by refusing to admit into evidence Tanner's videotaped interview with police. He also contends that this ruling prevented him from using the expertise of psychologist Dr. Reardon, who would have testified as to the meaning of Tanner's body language during the interrogation. We find appellant's arguments unpersuasive.

{¶ 36} The trial judge carefully listened to both sides on this issue before ruling that the videotape of Tanner was inadmissible. The tape reveals that Tanner agreed to answer questions concerning events that occurred earlier in the evening. However, he invoked his right to remain silent when questioned about the actual murder. Since the silence of a defendant is ambiguous and not probative of guilt

(see *Doyle v. Ohio* [1976], 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91; *State v. Combs* [1991], 62 Ohio St.3d 278, 281, 581 N.E.2d 1071, 1075-1076), the trial court did not abuse its discretion and appellant was not prejudiced by the exclusion of this videotape.

{¶ 37} For these reasons, we reject the third proposition of law.

Postponement of Sentencing

{¶ 38} In the fifteenth proposition of law, appellant contends that he was denied his constitutional and statutory right to effective proportionality review by the court's refusal to postpone sentencing until the conclusion of Tanner's trial. Appellant submits that the trial court's action prejudiced him, since Tanner received only a life sentence for McBride's murder.

{¶ 39} We have held previously that the disparity of sentence between accomplices does not justify reversal of a death sentence, where the sentence is neither illegal nor an abuse of discretion. *State v. Green* (1993), 66 Ohio St.3d 141, 151, 609 N.E.2d 1253, 1261. We reject appellant's argument, since there is no showing that Burke's death sentence was either illegal or an abuse of discretion.

{¶ 40} Further, we note that "trial courts have broad discretion to decide whether to grant a continuance." *State v. Powell* (1990), 49 Ohio St.3d 255, 259, 552 N.E.2d 191, 196. Here, the trial court did not abuse its discretion in refusing to postpone sentencing until after Tanner's trial. See *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080.

{¶ 41} Appellant's fifteenth proposition of law is overruled.

III

INDEPENDENT ASSESSMENT OF SENTENCE

{¶ 42} As required by R.C. 2929.05(A), we now independently review the death penalty sentence to determine whether the aggravating circumstances outweigh the mitigating factors and whether the sentence is appropriate and proportionate to the penalty imposed in similar cases.

**{¶ 43}** After independent assessment, we find that the evidence establishes beyond a reasonable doubt the aggravating circumstances appellant was found guilty of: (1) that the murder was committed for the purpose of escaping detection, apprehension, trial or punishment for another offense committed (aggravated robbery) (R.C. 2929.04[A][3]); and (2) that appellant was either the principal offender or committed the aggravated murder with prior calculation and design (R.C. 2929.04[A][7]). Prior calculation and design was proven by the fact that the victim was brutally stabbed twelve times and that five of the stab wounds showed evidence of healing, consistent with a prodding of the knife into the victim at least an hour before the final wounds were inflicted.

**{¶ 44}** We further find that the nature and circumstances of the offense provide no mitigating features. This was simply a cold-blooded murder of a seventy-two-year-old widower who unfortunately knew appellant well enough and trusted him to invite him into his home late at night. In their hunt for a gun, appellant and Tanner stabbed the victim twelve times and ransacked McBride's entire house. The two men were later overheard making light of the situation to family members by singing a song about going to Lucasville. Thus, under these circumstances, there is no evidence of mitigation.

**{¶ 45}** Further, while appellant's "history, character, and background" provide some mitigating value, we do not find it to be significant. Appellant's mother, who was an alcoholic, deserted the family when he was young. There was also evidence that because appellant's father and grandparents worked, he and his siblings were often left alone and were described as having raised themselves. Appellant also missed a great deal of school. Further, appellant was stabbed through the arm by his brother as a teenager. However, despite this negative family history, appellant was described by the minister who baptized him in 1988 as a "gentle spirit."

{¶ 46} As to the statutory mitigating factors, those factors listed under R.C. 2929.04(B)(1), (2), (4) and (5) have little or no weight. There was no evidence that the victim induced his attack. We further find that appellant was under no duress, coercion or provocation. Nor was his age of twenty-eight of any consequence. Finally, R.C. 2929.04(B)(5) has little applicability, since appellant had two prior theft convictions.

{¶ 47} R.C. 2929.04(B)(3) deserves some weight since appellant's I.Q. score placed him within the "borderline mentally retarded range of functioning loss." Nevertheless, Dr. Reardon, appellant's own expert witness, testified that appellant knew that he should not have gone to McBride's house the night of the murder and felt responsible for the death. Under these circumstances, we do not believe appellant lacked substantial capacity to appreciate the criminality of his conduct or to conform his criminal conduct.

{¶ 48} As to R.C. 2929.04(B)(6), the evidence is inconclusive as to who was the principal offender. Despite appellant's attempts to show that Tanner was solely responsible for the victim's death, his version of what occurred the night of the murder does not square with the evidence presented. Thus, appellant has not proven this factor.

{¶ 49} Under R.C. 2929.04(B)(7), the catchall category, we consider the testimony that appellant suffered from a "borderline personality disorder." *State v. Davis* (1992), 63 Ohio St.3d 44, 51, 584 N.E.2d 1192, 1198. However, since it does not rise to the level of a "mental disease or defect" under R.C. 2929.04(B)(3) (see *State v. Seiber* [1990], 56 Ohio St.3d 4, 9, 564 N.E.2d 408, 415), and since we believe appellant knew right from wrong, this is entitled to little weight. See *State v. Hill* (1992), 64 Ohio St.3d 313, 335, 595 N.E.2d 884, 901. Nor should residual doubt be given any weight. The evidence clearly shows that appellant intended to kill McBride and that he was responsible for the murder.

**{¶ 50}** In considering the manner in which the victim was repeatedly stabbed, the relationship between the victim and appellant as well as the fact that the victim was robbed of his property, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

**{¶ 51}** Finally, we conclude that the death penalty imposed in this case is neither excessive nor disproportionate to other similar capital cases involving murder combined with aggravated theft offenses. See *State v. Green* (1993), 66 Ohio St.3d 141, 151, 609 N.E.2d 1253, 1261; *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97; *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293. The fact that Tanner was subsequently sentenced to life imprisonment does not warrant reversal, since Burke's sentence was neither illegal nor an abuse of discretion. *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188.

**{¶ 52}** Accordingly, for the foregoing reasons, we affirm the conviction and sentence of death.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, PFEIFER and COOK, JJ., concur.

_____

APPENDIX

**{¶ 53}** "Proposition of Law No. I[:]   Prejudicial error occurs at the mitigation phase of the trial when the trial court refuses a request from the accused for an instruction on residual doubt and restricts defense counsel in commenting on it.

**{¶ 54}** "Proposition of Law II[:]   Prejudicial error occurs when the trial court refuses to allow relevant statements by the co-defendant into evidence during the first phase of the trial, when such statements are admissible under an exception to the hearsay rule.

{¶ 55} "Proposition of Law III[:]   Prejudicial error occurs when the trial court refuses to permit the introduction of a previous recorded statement of the co-defendant at the mitigation phase of the trial.

{¶ 56} "Proposition of Law IV[:]   The accused is denied his right to confrontation contra the Sixth Amendment to the Constitution when a tape recording of a crucial witness is 'lost' by the police, and said tape would assist the finder of fact in its determination regarding residual doubt.

{¶ 57} "Proposition of Law V[:]   Where the evidence demonstrates that the decedent did not die from stab wounds, the verdict is against the manifest weight of the evidence.

{¶ 58} "Proposition of Law VI[:]   The conduct of defense counsel during the conclusion of the penalty phase of the trial violated the appellant's right to effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 10, of the Ohio Constitution.

{¶ 59} "Proposition of Law VII[:]   The trial court committed prejudicial error in refusing to narrow the subgrouping in R.C. 2929.04(A)(7) by failing to delete 'prior calculation and design' from the specification, thereby denying the accused a fair trial contra the Sixth, Eighth, and Fourteenth Amendments to the Constitution and Article I, Section 10, of the Ohio Constitution.

{¶ 60} "Proposition of Law VIII[:]   Prosecutorial misconduct during the penalty phase of the closing arguments denied the accused a proper hearing in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16, of the Ohio Constitution.

{¶ 61} "Proposition of Law IX[:]   The trial court commits prejudicial error in considering improper aggravating circumstances in its written decision, thus denying the accused his Eighth and Fourteenth Amendment rights to the Constitution.

{¶ 62} "Proposition of Law X[:]    A.   The felony specification of R.C. 2929.04(A)(7) fails to narrow the class or persons eligible for the death penalty, and therefore, violates the Eighth and Fourteenth to the U.S. Constitution and Article I, Section 9, of the Ohio Constitution.  B.   Under the facts and testimony presented in this case, the felony specification of R.C. 2929.04(A)(7) failed to narrow the class or persons eligible for the death penalty, and the death sentence must be reversed.

{¶ 63} "Proposition of Law XI[:]   The trial court erred by instructing the jury at the mitigation phase of the trial that its sentencing option with respect to death is a recommendation.

{¶ 64} "Proposition of Law XII[:]   A.   Prejudicial error occurs when the statement of the accused taken at police headquarters is admitted into evidence, which is involuntary as a matter of law.   B.   Prejudicial error occurs when the statements given by the accused are introduced in their entirety in rebuttal.

{¶ 65} "Proposition of Law XIII[:]   When the accused is not present during crucial portions of his trial, and does not personally waive his presence, he is denied his Fifth and Sixth Amendment rights under the U.S. Constitution and Article I, Section 10, of the Ohio Constitution.

{¶ 66} "Proposition of Law XIV[:]   The trial court commits prejudicial error in failing to excuse the alternate jurors from further proceedings once deliberation commenced in the mitigation phase, contra the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution.

{¶ 67} "Proposition of Law XV[:]   The trial court committed prejudicial error in refusing to postpone the sentence of the accused until the conclusion of the co-defendant's case, and the resulting sentence denied the accused effective review of the proportionality process in Ohio.

{¶ 68} "Proposition of Law XVI[:]     Prejudicial error occurs at the mitigation phase of the trial when the jury considers multiple murder counts and aggravating circumstances, contra the Eighth and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 9 and 10, of the Ohio Constitution.

{¶ 69} "Proposition of Law XVII[:]     When cumulative photos of the decedent are admitted into evidence, the prejudicial effect violates the accused's Sixth, Eighth, and Fourteenth Amendment rights to a fair trial.

{¶ 70} "Proposition of Law XVIII[:]     Where the trial court gives an improper jury instruction on voluntary manslaughter, the accused's Sixth and Fourteenth Amendment rights to a fair trial are violated.

{¶ 71} "Proposition of Law XIX[:]   The failure on the part of the trial judge to be present during the entire proceedings is prejudicial as a matter of law, and the result violates the accused's Sixth Amendment constitutional right to a fair trial.

{¶ 72} "Proposition of Law XX[:]     Mark Burke was denied a fair trial because of the ineffective assistance of his counsel, contra the Sixth and Fourteenth Amendments to the U.S. Constitution.

{¶ 73} "Proposition of Law XXI[:]     Imposition of the death sentence violates the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 9, 10 and 16, of the Ohio Constitution."

_____