The grand jury returned a six count indictment charging defendant Duane Gregley with two counts of aggravated murder, one count of attempted aggravated murder, one count of carrying a concealed weapon, one count of having a weapon under disability and one count of possessing a dangerous ordnance. The aggravated murder counts contained mass murder and firearm specifications. The state sought the death penalty. At the close of evidence during the guilt phase of the trial, the court dismissed the dangerous ordnance counts. The jury found defendant guilty of the remaining counts, but during the penalty phase of trial deadlocked over imposing the death penalty. The court then imposed consecutive life sentences without parole on the aggravated murder counts, in addition to sentences for the remaining counts. In this appeal, defendant challenges (1) the court's refusal to permit the jury to consider voluntary manslaughter as a lesser included offense; (2) the jury instructions containing a reference to the specification "mass murder"; (3) the weight of the evidence; and (4) the court's restriction of cross-examination.
The murder counts arose from a shooting in a convenience store in which two victims were killed, but a third escaped without injury. The state's evidence showed that one of the murder victims, Donald Whitt, and defendant were involved in an extended fistfight — part of an ongoing dispute about who controlled what street corner for selling drugs. The girlfriend noted that Whitt's hand was painfully swollen. Whitt himself complained to her that defendant had kicked him in the eye. Whitt eventually left the scene of the fight and drove away in his car.
At the same time, the other murder victim, Jermaine Davis, and the third victim, Willie Whatley, arrived at the apartment of Whitt's girlfriend looking for Whitt. Whitt was not present, so they paged him. Whitt returned to his girlfriend's apartment shortly thereafter, and all present could see that Whitt had been in a fistfight. The three men briefly discussed what happened between Whitt and defendant, then decided to head to a bar down the street for a drink. Along the way, Whitt said he needed to stop in a neighborhood variety store in order to change money. When they arrived at the store, they saw defendant standing near the door. Whitt and defendant exchanged angry words for a few minutes, but Whatley told Whitt to "leave it alone."
Whitt, Davis and Whatley entered the store. About four to five minutes later, defendant entered the store, removed a semi-automatic weapon from his waistband, and said to them, "you all going to lay it down." Whatley understood this remark to mean that they were going to be killed. Defendant said, "I don't take threats lightly," and began shooting at Whatley. Whatley fell back over a potato chip rack and covered himself as defendant fired several shots at him. Whitt and Davis tried to flee the store, but defendant shot them in the back as they neared the front of the store. Whatley testified defendant stood over Whitt and Davis and took turns shooting them as they lay on the ground. Whatley took this opportunity to flee the store. He testified that as he ran through the front door, defendant took more shots at him.
Two undercover police officers were cruising the street when they saw a man frantically waiving them down. They learned from this male that there had just been a shooting at the variety store. When the police entered the store, they surmised they had done so just seconds after the shooting because the air was thick with gunsmoke. They found Whitt and Davis, laying in a heap near the front of the store. Both were dead, the victims of multiple gunshot wounds to the head.
A worker at the variety store corroborated Whatley's testimony. She said her boss asked her to go outside and ask Whitt to come into the store because Whitt often had money on him that the store could change. The three men entered the store and the worker went to stock shelves. She then heard the store door slam and saw defendant standing there with what looked like a small machine gun. She heard defendant say, "I don't take threats lightly," and heard (but did not see) a shot. She fled the store and heard more gunshots.
The police later determined that all of the bullets recovered from the bodies and bullet casings found in the variety store came from the same gun.
Defendant did not put on a defense.
 I
The first assignment of error complains the court erred by failing to instruct the jury on voluntary manslaughter. He argues the state's witnesses gave sufficient testimony from which a trier of fact could have found he acted under a sudden passion and/or a fit of rage.
R.C. 2903.03 (A) defines voluntary manslaughter as:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *
The influence of sudden passion or a fit of rage, as described in R.C. 2903.03 (A), are mitigating circumstances and not elements of the crime of voluntary manslaughter. See State v. Tyler (1990),50 Ohio St.3d 24, 37; State v. Muscatello (1978), 55 Ohio St.2d 201.
Voluntary manslaughter is an inferior degree offense of aggravated murder, not a lesser included offense. See State v.Shane (1992), 63 Ohio St.3d 630, 632. In Shane, the supreme court stated:
 Voluntary manslaughter is an inferior degree of murder, for "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements * * *." Even though voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test to be applied as when an instruction on a lesser included offense is sought. Thus, a defendant charged with murder is entitled to an instruction on voluntary manslaughter when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter.
Shane, 63 Ohio St.3d at 632 (citations omitted); see, also, Statev. Rhodes (1992), 63 Ohio St.3d 613.
The defendant bears the burden of establishing "by a preponderance of the evidence the existence of one or both of the mitigating circumstances." Rhodes, 63 Ohio St.3d at 617-618. The mitigating circumstances of provocation involves both objective and subjective components:
 In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the "* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *" must be considered. [State v. Deem (1988), 40 Ohio St.3d 205], paragraph five of the syllabus. If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. In that event, the objective portion of the consideration is not met, and no subsequent inquiry into the subjective portion, when the defendant's own situation would be at issue, should be conducted.
Shane, 63 Ohio St.3d at 634 (footnote omitted).
Reasonably sufficient provocation is that which is "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Shane, 63 Ohio St.3d at 635. Generally, the victim's "mere words" do not constitute reasonably sufficient provocation. Id. at 637. Whether the defendant has presented evidence of reasonably sufficient provocation must be decided by the trial court as a matter of law, based on the specific case facts viewed most favorably to the defendant. Id.
We find the court did not err by refusing to instruct on the inferior degree offense of voluntary manslaughter because the evidence did not reasonably permit the jury to reject the offense of aggravated murder in favor of a guilty finding on voluntary manslaughter. It is true the evidence showed defendant and Whitt engaged in extended fisticuffs, and the evidence likewise suggested that defendant emerged the victor. Defendant claims this evidence, coupled with his statement that he would not take any threats lightly, suggest these unnamed threats constituted sufficient provocation for him to kill. We disagree. The law calls for "sudden" provocation, a term that suggests immediacy of action — not action brought about with time for reflection. The evidence shows the fight occurred well before the shootings, with enough time having elapsed such that under no circumstance could evidence of threats be considered "sudden" or immediate.
The evidence also showed that heated words were exchanged by defendant and Whitt outside the variety store, but this circumstance alone was insufficient to establish sudden passion. Words alone will not constitute sufficient provocation to incite the use of force in most situations. Shane, 63 Ohio St.3d at paragraph two of the syllabus. Moreover, even those words could have been sufficient provocation, the evidence clearly showed that defendant parted from the three victims as they entered the store. He returned four to five minutes later with a gun, bent on revenge. Again, the evidence does not suggest that defendant acted suddenly; rather, he acted with time to reflect on the consequences of his deed. The first assignment of error is overruled.[1]
 II
The second assignment of error complains about the court's instructions to the jury in two respects. First, defendant complains the court provided the jury with an incorrect presumption instruction that if a wound is inflicted upon a person with a deadly weapon in a manner intended to destroy life, the purpose to cause death may be inferred from the use of the weapon. Defendant maintains this amounts to an impermissible mandatory presumption. Second, defendant complains the court's reference to the capital murder specification as "mass murder" created "an unfairly prejudicial connotation that mulitple killings occurred." He claims the Revised Code does not use the words "mass murder" to describe the specification and, instead, suggests that the relevant specification is more aptly described as "a course of conduct" specification.
 A
The court instructed the jury as follows:
 If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon.
In State v. Stoudemire (1997), 118 Ohio App.3d 752, we considered an identical instruction in the context of plain error. We stated:
 In State v. Montgomery (1991), 61 Ohio St.3d 410, 575 N.E.2d 167, the court upheld the validity of this instruction. The court found that the words "may be" modified the word "inferred" to such an extent that "[n]o reasonable jury could have felt compelled to presume intent on the basis of the trial judge's instruction." Id. at 415, 575 N.E.2d at 172; see, also, State v. Taylor (Nov. 9, 1995), Cuyahoga App. No. 65711, unreported, at 23-24, 1995 WL 663267. We find no plain error in this instruction.
Stoudemire, 118 Ohio App.3d at 761.
Defendant did not object to the court's instruction and, like Stoudemire, we find no plain error.
 B
Defendant next argues the court should not have referred to the captial murder specifications as "mass murder" specifications. There was no objection to the use of this term at trial, so we must proceed with a plain error analysis. We can only find plain error if it appears on the face of the record not only that the error was committed but that, except for the error, the result of the trial clearly would have been otherwise and that not to consider the error would result in a clear miscarriage of justice.State v. Willifford (1990), 49 Ohio St.3d 247, 253. Morever, we take notice of plain error only under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v.Long (1978), 53 Ohio St.2d 91, syllabus.
R.C. 2929.04 (A) (5), provides a capital murder specification when "the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." While the jury did not impose the death penalty, defendant claims the term "mass murder" is a misnomer because it is not necessary that more than one person be killed by the offender; thus, the term "mass murder" is not only misleading, but highly prejudicial and likely contributed to the jury finding him guilty in the penalty phase of trial.
The specification set forth in R.C. 2929.04 (A) (5) has been variously referred to as a "mass murder" specification; a "mutiple murder" specification; and "a course of conduct" specification. While it is true the words "mass murder" are not found in the statute, the Committee Committee Comment to R.C. 2929.04 (A) (5) reiterates that one of the aggravating circumstances justifying the imposition of the death penalty is "mass murder." Our research indicates the courts have used the term "mass murder" to refer to the specification set forth in R.C. 2929.04 (A) (5), and we cannot find (nor does defendant cite us to) a single authority condemning the use of the term.
Regardless of what the R.C. 2929.04 (A) (5) specification is called, the use of the term "mass murder" under the circumstances cannot rise to the level of plain error. "Mass. murder" arguably suggests the killing of more than one person, a fact that indisputably occurred in this case. We cannot say the jury found defendant guilty of two counts of murder solely because the indictment labeled the aggravated murder specification as "mass murder." The second assignment of error is overruled.
 III
In his third assignment of error defendant complains the verdicts are against the manifest weight of the evidence. He assails the credibility of the state's witnesses and questions whether some other person might have been the shooter.
A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. State v. Thompkins (1997),78 Ohio St.3d 380, 386-387. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them." Id.
We find the state presented overwhelming and credible evidence to show defendant committed the acts in question. The eyewitness testimony of Whatley, the sole surviving victim, appears accurate and compelling. He placed defendant in the store with a gun. Another witness, a worker at the variety store, corroborated defendant's presence in the store, his possession of gun, and his statement that he did not take threats lightly.
Defendant argues the physical evidence of gunshot wounds did not correspond with Whatley's testimony that defendant shot the two murder victims at close range. The coroner testified that the shots must have been fired more than one and one-half feet from the victims. We find this matter insignificant. Whatley testified defendant stood over Whitt and Davis and took turns shooting them at close range. The coroner's testimony that no fouling or stippling occurred simply meant that defendant fired his gun from more than eighteen inches away. This does not contradict Whatley's testimony, for a person firing a gun at even three feet away from a person could be considered to have fired the gun at close range.
Defendant also assails the credibility of the store clerk, saying her admission that she was an addicted to crack necessarily put her ability to recall facts into question. We reject this proposition, for there was no testimony that the clerk's mental abilities were impeded at the time of the murders. To the contrary, her testimony corresponded to a very high degree with Whatley and that of her employer.
Having reviewed the evidence in its entirety, we find nothing in the record to show the jury lost its way in finding defendant guilty. The third assignment of error is overruled.
 IV
The fourth assignment of error complains the court abused its discretion by limiting the cross-examination of the store owner in two ways. First, the defense tried to ask the owner whether Whitt had sold drugs out of her store. It wanted to pursue this line of questioning because it learned the store had been closed because drugs had been dealt from the store. Second, the defense tried to ask the owner whether she made any deals with the state in exchange for her testimony. The court refused this line of questioning upon representations from the state that no deals had been made with owner and that she had not been indicted for any offenses.
The Sixth Amendment to the United States Constitution, as applicable to the states, guarantees the right to cross-examine witnesses. To that end, Evid.R. 611 (B) states, "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." The key word for our purposes is relevant." Hence, the court necessarily controls the scope of cross-examination and we review complaints about the court's action for an abuse of discretion. State v. Ferguson (1991),71 Ohio App.3d 342; State v. Vinson (1990), 70 Ohio App.3d 391. The court may exercise its discretion to control cross-examination "* * * based on concerns about * * * confusion of the issues * * * or interrogation that is repetitive or only marginally relevant." State v. Green (1993), 66 Ohio St.3d 141, 147.
During the store owner's cross-examination, it came out that her store had been shut down in a drug raid when the police found drugs in the store. When the owner denied that the drugs found in the store belonged to Whitt, defense counsel asked her whether the police might have missed "his load, csh [sic] hoard or whatever?" The court sustained an objection. Defense counsel then asked "who's drugs were found in your store?" Again, the state objected and at the sidebar the defense asked whether the owner "is under indictment or something for those drugs?" The state replied in the negative, saying "she hasn't been indicted yet." Defense counsel then argued that he was entitled to bring out that the owner was being investigated and was likely going to be indicted, and "her testimony may bear out some expectations that she has about whether or not the prosecutors are satisfied with her testimony." The state strongly denied that any deal had been made, or that it had discussed the possibility of indictment with the owner. The court told the parties it believed it would be "inappropriate to go into what expectations she may have."
Under these circumstances, we cannot say the court abused its discretion by refusing to permit the defense from going into whether the owner had any "expectations" that her testimony, if favorable to the state, might lead to some plea bargain for an unrelated, unindicted criminal matter. There is no question that bargains between the state and a witness are fair game for impeachment, but the courts do not abuse their discretion by refusing to permit impeachment based on uncharged conduct. SeeUnited States v. Rodriguez-Andrade (C.A.7, 1995), 62 F.3d 948,952-953. Here, the state told the court that the store owner had not been indicted on any charges and defense counsel stated he had no reason to doubt the state's representation to the court. There being no charged offense facing the owner, cross-examination of the possibility that the owner might face charges would have been too speculative and run the risk of exposing the jury to irrelevant testimony. The fourth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 LEO M. SPELLACY. J., KENNETH A. ROCCO. J., CONCUR. 
__________________ JOHN T. PATTON PRESIDING JUDGE
[1] Defendant's brief also suggests the court erroneously believed defendant bore the burden of "proving" either sudden passion and/or a fit of rage. The brief makes no real argument in this respect so we disregard it pursuant to App.R. 12 (A) (2) and 16 (A).