OPINION
Defendant-appellant Safabian Stearns (appellant) appeals his convictions on two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), two counts of rape in violation of R.C.2907.02(B) and one count of kidnapping a minor with sexual motivation in violation of R.C. 2905.01(A)(4), which were entered against him in Cuyahoga County Common Pleas Court upon jury verdict. Appellant urges reversal of his convictions claiming that evidentiary rulings entered by the trial court violated his rights as protected by the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I, Ohio Constitution. We find no reversible error in the trial court proceedings and for the reasons stated below, we affirm.
At trial the state presented the testimony of eleven witnesses. The record reveals the following undisputed facts. On Sunday evening September 6, 1998, Tiffany Gilson (d.o.b. January 19, 1987), a mentally-challenged eleven-year-old third-grader, was reported missing to the Cleveland police by her family when she failed to arrive at church where she was to meet her mother. That night her family and police searched, without success, her expected route from the Gilson home at 113 Tuscora Avenue, up Lakeview Avenue, through the grounds of the Glenville Rec Center to E. 115 Street, crossing over to E. 117 Street to her anticipated destination, the Cleveland Temple, Church of God. Early the next morning, September 7, in the area of E. 117 Street and St. Clair Avenue, Patrolman John Mitchell, who had been assigned to look for the missing child, saw Tiffany walking alone and questioned her as to what happened. She told him they took me and explained by saying "sex." Patrolman Mitchell questioned her as to whether she had been raped and she responded yes. As a result, he immediately took Tiffany to Rainbow Babies and Children's Hospital where she was interviewed, examined and evidence was gathered.
Upon their arrival at Rainbow Babies and Children's Hospital, Ann Darby, a pediatric nurse, took Tiffany's history. Tiffany told Nurse Darby that she had been abducted by four men. She identified each man by description and wrote what each man had done to her. She described the four men as the light-skinned one, the "old man", the "son" and the "uncle." Dr. Anthony Villella, pediatric resident at Rainbow Babies and Children's Hospital, obtained Tiffany's history as taken by Nurse Darby and undertook Tiffany's physical examination with the knowledge that Tiffany claimed to have been assaulted by three or four men who had committed oral, anal and vaginal sex acts against her. Dr. Villella's examination revealed that Tiffany was already estrogenized, that is physically sexually matured. Her physical exam revealed that she had sustained no recent injury and, although he originally determined that no hymen was present, upon conferring with an experienced nurse practitioner and with the aid of photographs taken of Tiffany's genitalia, he determined that Tiffany's hymen was normal appearing. Dr. Villella and Nurse Darby labeled Tiffany's clothing and collected samples for the rape kit which was sealed and given to Patrolman Mitchell. Lauren McAliley, pediatric nurse practitioner, conducted a medical interview, a physical exam and a detailed exam of Tiffany's genitalia with a colposcope. Tiffany reported to her that four men touched her private, her butt and her breasts, both with their penises and their mouths, and these four men made her mouth touch their penises. Nurse McAliley found Tiffany to be sexually mature with her hymen estrogenized. Nurse McAliley was declared an expert and she opined that based upon her training, experience and her physical exam of Tiffany, the likelihood of sexual abuse of Tiffany was probable.
Patrolman Mitchell transported Tiffany, now accompanied by her mother, home from the hospital. On the way, he drove to the area where he found Tiffany. On E. 123 Street Tiffany was able to identify the two houses as the locations where the alleged assaults occurred, 617 E. 123 Street a gray house with the white trim, and 626 E. 123 Street a green house. Later that week, Tiffany and her mother met with Detective Parker, a thirteen-year veteran of the Cleveland Police Department Sex Crimes Unit, who took a statement from each. Tiffany described the inside of the house located at 617 E. 123 Street, described the four individuals who assaulted her and she recalled the name Omar as a fifth individual who was present in the house. During this interview, Tiffany again referred to the four individuals as the "old man", the "old man's son", the "uncle", and the "light-skinned one." The police obtained search warrants for both houses identified and executed the warrants on Friday morning. When the warrant was executed at the house located at 617 E. 123 Street, no one was present; the police confiscated a video camera, case and tripod, some X-rated videos, a box of Black and Milds, and mail addressed to Curtis Sanders. Four individuals were present at the house located at 626 E. 123 Street, who were identified as Beatrice Farrington, Katen Farrington, William Kimbrough III and Jamie Moore. The police arrested all three males. That day, two lineups were conducted, one involving Katen Farrington and the other Jamie Moore. Tiffany did not identify anyone from either lineup as an assailant and both Katen Farrington and Jamie Moore were released. At a subsequent lineup, Tiffany chose William Kimbrough III and identified him as the son. Detective Parker obtained arrest warrants for Omar Stearns, William Kimbrough, Jr. and Curtis Sanders.
The police transported Tiffany to the location at E. 123 Street where she observed Omar Stearns in a "cold stand" identification procedure but did not identify him as one of her attackers. William Kimbrough, Jr. and Curtis Sanders were arrested and charged in the crimes on Monday, September 14, 1998. The police obtained a second statement from Tiffany regarding the sexual assault which took place in the white car. On Friday, September 18, appellant was arrested by the Fugitive Task Force at the Garden Valley Apartment complex. Upon his arrest, appellant gave his statement to Detective Parker in which appellant denied having sex with Tiffany or forcing her to do anything. Omar Stearns was arrested but was subsequently released.
Four men, William Kimbrough, Jr.; William Kimbrough III; Curtis Sanders; and appellant; were charged with kidnap and rape by the Cuyahoga Count Grand Jury in a seventeen count indictment. Specifically, appellant was charged with one count of kidnapping with specification alleging a sexual motivation and five counts of the rape of a child under the age of thirteen by force. At his arraignment, appellant was found to be indigent, counsel was appointed, and appellant entered pleas of not guilty to each charge against him.
Court orders were obtained for blood and saliva samples from all four men and sent to the Cleveland Police Scientific Investigation Unit (SIU). Tina Stewart of the SIU prepared six reports which concluded that no semen was present from Tiffany's vaginal, oral or rectal swabs nor from the smear slides. However, the stain on Tiffany's blue-denim jumper and the stain on her panties tested positive for seminal fluid. The samples were stored for DNA analysis with blood and saliva standards from each of the four suspects and Tiffany. Selvarangan Ponnazhagan, Ph.D., a forensic scientist with the Cuyahoga County Coroner's Office, conducted tests on the evidence gathered in relation to Tiffany's alleged sexual assault and he determined that the sperm fraction of DNA found on her jumper and panties matched that of William Kimbrough, Jr. Testing also determined that William Kimbrough III, Curtis Sanders and appellant were excluded as donors of the semen samples. Subsequently, pursuant to an agreed plea arrangement, William Kimbrough, Jr. pled guilty to an amended indictment in exchange for his truthful trial testimony on behalf of the state.
Prior to trial, as relevant to this appeal, the state amended both counts two and three as charged against appellant from Rape to Gross Sexual Imposition, with the remaining charges against appellant unchanged. The matter was tried before a jury in a joint trial against appellant and two co-defendants, William Kimbrough III and Curtis Sanders.
Tiffany testified as to the events which occurred on September 6 and 7, 1998. She described the men who attacked her as the "light-skinned one", the "uncle", the "old man", and the brown-skinned one who was the "son of the old man." On the Sunday night when the events occurred she wore a blue-denim jumper with buttons up the front, a Tweetie Bird t-shirt, a bra, panties and socks. As she walked alone through the Glenville School and Rec Center area on her way to the church, the light-skinned one approached her and asked her questions. At trial, Tiffany identified appellant as the light-skinned one. She said appellant asked her whether she wanted to make money. When she said no, he asked whether she wanted twenty dollars. She again said no. Finally, she said he asked whether she wanted a fifty, but she said no.
She testified that she went with appellant to the gray house with the white trim where the uncle was. When she and appellant arrived at the gray house, they entered through the side door. The uncle and the old man were already at the house. Tiffany said that they did it to her in the living room. She testified that this meant that they had sex with her. She described the sex acts which the men performed. She stated that the appellant, the light-skinned one, and the uncle made her suck their penises. She said that uncle had sex with her with his penis touching her private part. She said appellant put his finger in her private part and he sucked on her breasts.
Tiffany was able to describe the interior rooms and furnishings of the gray house in detail and was able to identify the photographs of the interior of the house which were taken by the Cleveland police. She said that while she was at the gray house she went upstairs to use the bathroom and also went into the little bathroom off the kitchen. While she was in the house she saw the old man in the kitchen and she saw the uncle sell dope. At some point another man and a woman came into the house. She saw boxes of milds (Black and Milds cigars) on the see-through table. She said uncle talked on the phone and then told appellant to get his nephew, Omar. Then, appellant left the house.
Shortly thereafter, uncle and the old man walked her across the street to a green house with its porch light on. She entered the green house through the side door with the old man. Once inside, the old man, whom she identified as William Kimbrough, Jr., took her to a bedroom, shut the door and fastened it at the top with a screwdriver. There William Kimbrough, Jr. touched her private part with both his tongue and with his penis. While she was at the green house, she saw the old man's son. Later that night, William Kimbrough, Jr. put her into a white car with his son, William Kimbrough III, who drove with her to the YMCA parking lot. At the YMCA parking lot, William Kimbrough III made her suck his penis. After that, William Kimbrough III removed her panties, put on a condom and did it to her. He took her back to the green house, put her in the bedroom, turned on the TV and locked her in. In the morning, William Kimbrough, Jr. let her go. She started walking to her uncle's house but a policeman stopped her. When she told the policeman that she had been raped, he took her to the hospital.
Tiffany testified that while at the hospital she cried and told the nurse and doctor what had happened to her. She removed her clothing on a sheet and was examined in her private part and was given something to wear. She described her attackers to the hospital personnel as the light-skinned one, the uncle, the old man and the brown skinned man, the son of the old man.
When Tiffany left the hospital, she identified the gray house with the white trim and the green house where the sexual assaults occurred. Later, Tiffany went downtown where she talked to Det. Parker and her partner and made a statement. Tiffany identified appellant as the light-skinned one in the line-up conducted and identified co-defendant William Kimbrough III as the brown-skinned son of the old man. On a different day, she identified William Kimbrough, Jr., while he was in a blue car passing by the houses at E. 123 Street, as the old man. Tiffany identified co-defendant Curtis Sanders as the man everyone called the uncle.
On cross-examination, Tiffany restated that appellant sucked her breasts, put his finger into her private part and forced her to suck his penis while they were at Curtis Sanders' house. Tiffany conceded that appellant did not display a gun, knife or other weapon.
On redirect examination, Tiffany asserted that she did not want appellant, the old man, the uncle or the son to do these things to her and she testified that she was afraid while she was in the gray house, in the green house and in the white car where the sexual assaults occurred.
William Kimbrough, Jr. (Jr.), identified by Tiffany as the old man, testified on behalf of the state as follows. Jr. is fifty-seven years old and lives at 626 E. 123 Street (the green house) with his mother, step-father, and his son, co-defendant William Kimbrough III. Jr. testified that unc is the street name of co-defendant, Curtis Sanders. Sanders sells dope out of the gray house with white trim across the street at 617 E. 123 Street. Jr. spends every day at Sanders' house pitching horseshoes or cooking up cocaine. Sanders' house is a place where people purchase dope, girls come to perform sexual favors or clean the house, and people take pictures with the video camera. Jr. testified that appellant and his cousin, Omar Stearns, had previously brought girls to Sanders' house. Jr. engaged in sexual activity with girls at the house and he has observed Sanders engage in sexual activity there.
Jr. said that on September 6 he was at Sanders' house and had cooked up some dope at Sanders' request. That night, Jr. sat on the porch waiting for customers to come for a drug transaction. When they arrived he would call for Sanders. He saw appellant, accompanied by a girl wearing a starter jacket, a blue-jean dress and tennis shoes, arrive, knock on the door and call out for Sanders. The girl waited on the porch until appellant told her to come into the house. Jr. testified that although he stayed on the porch, he looked through the window into the living room and was able to see both appellant and Sanders messing with the girl, playing with her breasts. Jr. remained on the porch smoking crack until Sanders came out. Fifteen or twenty minutes later, appellant left the house claiming he was going to the store, but Jr. observed he went in the opposite direction. Sanders returned into the house while Jr. remained on the porch. A man came looking for Sanders, so Jr. went into the house and called out for Sanders. When he failed to hear an answer from Sanders, Jr., he walked toward the living room where he saw Sanders with the girl. Jr. backed-off and called Sanders name again; then, Sanders, zipping up his pants, came out of the living room. Jr. observed the girl's unbuttoned dress while she attempted to cover herself with her hands. Sanders went outside and took care of his business.
During that evening, Omar Stearns came to Sanders' house but did not stay. Sanders offered Jr. a couple of stones to take the girl out of the house. Jr. assumed that Sanders meant to take the girl to do what he wanted with her because that was what they had done with girls previously. Jr. said that it did not cross his mind that Tiffany was a minor although he admitted he thought she did not seem very streetwise. When Omar came back, Jr. removed Tiffany into a little room off the kitchen. When Omar went into the dining room, Jr. took Tiffany outside and offered her a ride. He took a ten-dollar bill out of her jumper pocket and drove her to the gas station where he spent the money on pop, cigars and gas.
Jr. brought Tiffany back to his house where, after he wedged the bedroom door shut with a screwdriver, he engaged in both oral and vaginal sex with Tiffany without using a condom. Later, Jr. saw his son, co-defendant William Kimbrough III, talking to Tiffany when she was sitting on the porch railing at Sanders' house. That night, Jr. left the area and went to the Garden Valley apartments where he picked up a girl. When he returned about four or five in the morning, he saw Tiffany still sitting on Sanders' steps and advised her not to wait there. Later, when he pulled his car into the backyard, he noted that Tiffany was gone and he did not see her again.
On cross-examination, Jr. conceded that in the first statement which he made to the police he denied having sex with Tiffany. But, after the DNA tests confirmed that he did have sex with her, pursuant to a plea agreement, he entered a guilty plea to some counts in the indictment.
The state rested its case; counsel for each defendant moved for acquittal pursuant to Crim.R. 29. As relevant to this appeal, the trial court granted appellant's motion for acquittal as to count six of the indictment which charged him with one count of rape.
In his defense, appellant testified as to his version of the events of September 6, 1998. Appellant stated that while he was walking through the Glenville Recreation field he saw Tiffany. He was smoking a blunt and she approached him asking for a light. They conversed, he thought that she was at least sixteen years old. He left the Rec Center to go to Tuscora Avenue, but he asked her to wait for him. He returned after fifteen minutes and they engaged in kissing and fondling for ten minutes. He suggested that they go to unc's house, home of Curtis Sanders, where they could have further sexual activity. Tiffany went with him voluntarily. When they arrived at Sanders' house, appellant directed her to wait on the porch until he got permission from unc to chill. Then, he and Tiffany went into the TV room where they stayed about twenty minutes smoking some reefer and listening to music. Appellant denied engaging in sexual activity with Tiffany at Sanders' house. Subsequently, he left the house to get some blunts to smoke.
On September 18, because he understood that the police were looking for him, he called the FBI and advised them that he intended to turn himself in. He met the police at the Garden Valley Apartments and turned himself in. He was taken directly to the Sex Crime Unit where he was interviewed by Det. Parker. Although he understood his right to remain silent, he made a statement to the police. During his statement he cried because he was scared. He said he did not know that Tiffany was only eleven years old.
On cross-examination, appellant denied making Tiffany have oral or vaginal sex with him, he denied seeing Sanders fondle or have oral or vaginal sex with Tiffany, and he claimed that William Kimbrough, Jr. could not have observed him fondling Tiffany. Appellant conceded that although it was his intention to have sex with Tiffany when he walked from the Rec Center to Sanders' house, he left Sanders' house to get some blunts and he did not return because he went to his grandmother's house to get his crying baby.
Curtis Sanders testified on his own behalf admitting that in 1990 he was found guilty of drug abuse and drug trafficking. After serving his term of imprisonment, Sanders said he started living a good life. He and Kimbrough, Jr. fixed up his house providing a place where people come to play horseshoes, dominos and cards. Sanders said he is known as uncle in the neighborhood. The night appellant brought Tiffany to his house Sanders said he was on the porch using the phone. Jr. was on the porch sitting on a chair. Appellant took the girl into the house, but Sanders did not see her. About fifteen to twenty minutes later, when appellant called to Sanders, he responded and entered the dining room. Appellant asked him for El Producto cigars, but Sanders told appellant that he did not have any and Sanders returned to the porch. Twenty or thirty minutes later as appellant was leaving, Sanders requested appellant to tell his cousin Omar to come by if appellant saw him. After appellant left, Sanders went into his house and was surprised to see Tiffany was still there. Tiffany told Sanders that she was waiting for appellant. Jr. volunteered to take Tiffany home. Sanders estimated that the total time that Tiffany was at his house was one hour to one and one-half hours. Sanders spent most of that time outside on the porch talking on the phone. Sanders denied touching Tiffany or having either oral sex or sexual intercourse with her. After Tiffany left his house, Sanders said he went to a bar and stayed until closing time.
The defense rested for appellant, Curtis Sanders and William Kimbrough III. Defense counsel renewed motions for acquittal pursuant to Crim.R. 29 and closing arguments were made. As to appellant, the matter was submitted to the jury as follows: on count one, kidnapping; amended counts two and three, gross sexual imposition; and counts four, five on rape; and count eight, rape on the theory of aiding and abetting a rape. The jury returned verdicts of guilt as to appellant on counts one, two, three, four and eight and returned a verdict of not guilty on count five. At appellant's sentencing, the state dismissed the sexually violent predator specification on the counts for which he was found guilty, and after hearing the court classified appellant as a sexually-oriented offender as defined in R.C. 2950, et seq. Appellant was sentenced as follows: on appellant's conviction on count one, kidnapping, the trial court imposed a five-year term of imprisonment to run consecutively to two terms of mandatory non-probational life imprisonment as imposed on counts four and eight; for rape, which were to run concurrent to each other; and on counts two and three, gross sexual imposition, the court imposed a term of two years, each to run concurrent with each other and all other counts. Appellant timely appeals his convictions and advances three assignments of error for our review.
 I. THE TRIAL COURT IMPROPERLY RESTRICTED THE APPELLANT'S CROSS-EXAMINATION OF STATE WITNESSES.
 II. THE TRIAL COURT IMPROPERLY RESTRICTED THE DIRECT EXAMINATION OF THE APPELLANT AND THE APPELLANT'S CLOSING ARGUMENT.
 III. THE TRIAL COURT IMPROPERLY RESTRICTED THE APPELLANT'S RIGHT TO COMPULSORY PROCESS BY PROHIBITING A DEFENSE WITNESS FROM TESTIFYING.
In each assignment of these assigned errors, appellant complains that the trial court restricted appellant's presentation of evidence. It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 180. An abuse of discretion is more than an error of law and judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Steiner v. Custer (1940), 137 Ohio St. 448, 451. A reviewing court "will not reject an exercise of this discretion unless it clearly has been abused and the criminal defendant thereby has suffered material prejudice." State v. Long (1978),53 Ohio St.2d 91, 98.
The record demonstrates that appellant was convicted of one count of kidnapping a minor with sexual motivation in violation of R.C. 2905.01(A)(4), which required the state to show beyond a reasonable doubt that appellant, by force or any means, removed Tiffany Gilson, a child under the age of thirteen, from the place where she was found and/or restrained her liberty for the purpose of engaging in sexual activity as defined in R.C. 2907.01 with her against her will. No demonstration of force is required to be shown. At trial, appellant admitted that he walked Tiffany from the Glenville Rec Center to Sanders' house with the intention of engaging in sexual activity with her.
Further, appellant was convicted of two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), which consists of sexual contact with another, not his spouse, and less than thirteen years, whether or not the offender knows the age of the person. At trial, appellant conceded that he fondled and sucked Tiffany's breasts. Tiffany's testimony corroborated appellant's admission.
Finally, appellant was convicted of two counts of rape in violation of R.C. 2907.02(B), which required the state to show that he engaged in sexual conduct with Tiffany by purposely compelling her to submit by use of force or threat of force. One of the two counts for which appellant was convicted was for appellant's aiding and abetting rape. The jury was properly instructed that force need not be openly displayed or physically brutal but can be subtle and psychological. If the victim's will was overcome by fear or duress the element of force has been proven. See State v. Fowler(1985), 27 Ohio App.3d 149. In this case, Tiffany described two acts of appellant's sexual conduct with her when she claimed that appellant made her suck his penis and she claimed appellant placed his finger into her vagina. Moreover, Tiffany testified that she did not want to engage in sexual conduct with William Kimbrough, Jr.; Curtis Sanders; William Kimbrough III; or appellant; and Tiffany testified that she was in fear while she was in the gray house, the green house and the white car where each of the sexual assaults had occurred.
In his first assignment of error, appellant complains that the trial court erred by improperly restricting his cross-examination of Patrolman Mitchell and William Kimbrough, Jr., thus mandating a new trial. Specifically, appellant complains that the court should have permitted Patrolman Mitchell to state whether the victim sustained bruises to her neck and should have permitted William Kimbrough, Jr. to testify as to the full benefits of his plea bargain and whether Kimbrough, Jr. ever forced Tiffany to do anything.
The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" The right embodied by the Confrontation Clause applies to the states through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas (1965), 380 U.S. 400, 406, 13 L.Ed.2d 923,85 S.Ct. 1065. See, also, State v. Madison (1980), 64 Ohio St.2d 322,325. The Ohio Constitution contains an analogous provision. Section 10, Article I states that "in any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel * * * [and] to meet the witnesses face to face[.]"
Although cross-examination of a witness is a matter of right, the extent of such cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. State v. Green (1993), 66 Ohio St.3d 141, 147,609 N.E.2d 1253, citing Alford v. United States (1931), 282 U.S. 687,691, 75 L.Ed. 624, 51 S.Ct. 218. "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). It is within the trial court's discretion to control the scope of cross-examination. State v. Woodard (1993), 68 Ohio St.3d 70,78. "The trial judge is posited with broad discretion in controlling cross-examination, and the appellant has the burden to show a patent abuse of discretion." State v. Walker (1978),55 Ohio St.2d 208, 214. Thus, a criminal defendant is not entitled to question an adverse witness in an unrestricted manner.
A careful review of the record reveals that no basis existed in the record for a question to Patrolman Mitchell as no evidence was presented to show that Tiffany suffered any physical injury. Further, no prejudice to appellant can be shown by the restriction of any testimony regarding the lack of injury where the emergency room doctor testified that there were no signs of recent injury. Finally, as stated above, physical injury is not an element necessary to the finding of guilt for any of the offenses at issue in this matter.
The record further demonstrates that the trial court properly balanced the conflicting interests relative to the cross-examination of the co-defendant William Kimbrough, Jr. when it considered that the jury be informed of his possible motives for testifying, but that the jury not consider punishment when deliberating as to the innocence or guilt of the defendants.
Finally, our review of the record demonstrates that appellant's counsel thoroughly questioned William Kimbrough, Jr. as to the issue of force.
Accordingly, we find no error in the rulings of the trial court relative to the cross-examination of witnesses at trial. Appellant's first assignment of error is without merit.
In his second assignment of error, appellant complains that the trial court improperly restricted his direct examination and his closing arguments by denying him the opportunity to introduce relevant evidence. Specifically, appellant complains that he was precluded from answering whether he forced Tiffany to go with him, he was precluded from testifying as to what Tiffany told him, he was precluded from presenting the real reason that he did not have sex with Tiffany, and he was precluded from asserting during closing argument that he took Tiffany to Uncle's house after "they" had agreed to go there.
First, as we have stated above, the use of force is not an element of kidnapping, thus rendering appellant's answer to the question irrelevant. Further, the line of questioning relative to what Tiffany told appellant constitutes hearsay and pursuant to Evid.R. 802 was properly excluded. Finally, a review of the record fails to disclose any abridgment of appellant's opportunity to present direct testimony as to his real reason for not having sex with Tiffany. Accordingly, we do not find any improper restriction by the trial court of appellant's direct examination, which denied appellant the opportunity to introduce relevant evidence.
Appellant further complains that the trial court erred in sustaining the state's objection to the remark of his counsel during closing argument by which counsel indicated that appellant took Tiffany to Sanders' house after they had agreed to go there. The record demonstrates that conflicting evidence had been presented as to whether Tiffany agreed to accompany appellant. Thus, under the circumstances, the trial court should have permitted counsel's reference to the agreement of going to Sanders' house. However, counsel was able to remind the jury that appellant's testimony at trial and appellant's statement to the police indicated that Tiffany agreed to go to Sanders' house.
It is well-settled that remarks made by counsel during opening statements and closing arguments are not evidence. The trial court properly instructed the jury that closing arguments is not evidence to be considered in the case. The jury is presumed to follow the instructions given by the trial judge. State v. Coleman (1999),85 Ohio St.3d 129. Therefore, we presume that the jury considered the evidence as presented at trial and find any error in the trial court's limitation of counsel's closing argument on this issue to have been harmless error. Appellant's second assignment of error is without merit.
In his third assignment of error, appellant contends that the trial court restricted his right to compulsory process when it refused to allow his mother to testify to rebut the testimony of Sgt. Charles Boddy of the Fugitive Task Force. Specifically, appellant complains that Sgt. Boddy's testimony implied that appellant must be guilty or he would have turned himself over to the police. Appellant asserts that the testimony which was excluded by the court would have shown that appellant wanted to turn himself over to the police.
We find no abuse of the trial court's discretion in excluding a witness where the witness was not identified on appellant's witness list and the witness had remained in the courtroom during the testimony of Sgt. Boddy despite an order for separation of witnesses. Moreover, appellant makes no assertion that the excluded witness had any information relating to the circumstances concerning the crimes as charged to appellant. Appellant's third assignment of error is without merit.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ______________________________________ TIMOTHY E. McMONAGLE, PRESIDING JUDGE
ROCCO, J. and BLACKMON, J., CONCUR.