DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Thomas J. Keenan, appeals his conviction in the Lorain County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On December 11, 2005, a fight broke out in the parking lot of Midway Mall. At first, the fight involved Jeremy Flynn and a single individual. Soon, several other men joined the fray. One of the men struck the back of Flynn's head with a black object, and Flynn fell to the ground. The men fled on foot, but were apprehended by police in another nearby parking lot. The police officers who responded returned to the Midway Mall parking lot with three suspects. Witnesses at the scene identified Keenan as a man they had seen holding a gun at the time of the attack. A grand jury indicted Keenan on two counts of felonious assault in violation of R.C. 2903.11(A)(1) and one count of aggravated riot in violation of R.C. 2917.02(A)(2). Each of these charges was accompanied by a firearm specification pursuant to R.C. 2941.145. The *Page 2 
indictment also charged Keenan with one count of aggravated menacing in violation of R.C. 2903.21(A). The state dismissed the charge of aggravated riot at trial.
 {¶ 3} A jury found Keenan guilty of each charge and specification, and the trial court sentenced him to prison terms of three months for each count of felonious assault, six months for aggravated menacing, and three years for the firearm specifications, which merged for purposes of sentencing. The trial court ordered that Keenan's sentences for each count were to be served concurrently, but that those prison terms were to be served consecutive to the term imposed for the firearm specification for a total prison term of six years. Keenan timely appealed.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ABUSED ITS DISCRETION BY PROHIBITING [KEENAN'S] CROSS-EXAMINATION OF WITNESSES, THEREBY DEPRIVING [KEENAN] OF A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, § 10 OF THE OHIO CONSTITUTION."
 {¶ 4} In his first assignment of error, Keenan argues that the trial court abused its discretion and denied him a fair trial by limiting the scope of the cross-examination of two police officers. Keenan proffered that their testimony would undermine the credibility of testimony related to an out-of-court identification by three witnesses to the attack on Flynn. This Court does not agree that the trial court abused its discretion.
 {¶ 5} Cross-examination is permitted on "all relevant matters and matters affecting credibility." Evid. R. 611(B). Criminal defendants enjoy the right to cross-examine witnesses as provided by Evid. R. 611(B), but the scope of cross-examination is a matter within the discretion of the trial court. State v. Green (1993), 66 Ohio St.3d 141,147, certiorari denied 510 U.S. 891. See, also, R.C. 2945.03 (providing that trial courts "control all proceedings during a criminal *Page 3 
trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue.");State v. Nields (2001), 93 Ohio St.3d 6, 28, citing R.C. 2945.03. For example, "[t]rial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation." State v. Treesh
(2001), 90 Ohio St.3d 460, 480, citing Delaware v. Van Arsdall (1986),475 U.S. 673, 679. This Court reviews a trial court's decision to limit the scope of cross-examination for an abuse of discretion.Treesh, 90 Ohio St.3d at 480. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. An abuse of discretion demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Ports v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. Id.
 {¶ 6} A challenge to the admissibility of identification testimony on the basis that it was illegally obtained must be raised before trial in a motion to suppress. Crim. R. 12(C)(3). As the trial court observed, Keenan did not file a motion to suppress and could not raise the admissibility of the identification testimony during trial. Consequently, he now argues that the trial court abused its discretion by prohibiting the officers from providing testimony that could have borne on the credibility of the identification testimony provided by the eyewitnesses to the fight. See, generally, Manson v. Brathwaite (1977),432 U.S. 98, 116 (noting that the circumstances surrounding an admissible out-of-court identification bear on the weight of the evidence.). *Page 4 
 {¶ 7} Keenan attempted to cross-examine officers Brian Rado and Daniel Marsico regarding the procedures that they usually follow for out-of-court identification of criminal suspects. Rado and Marsico's testimony, near the conclusion of the State's case, followed the testimony of three eyewitnesses to the attack on Flynn. The eyewitnesses testified that they identified three of the four suspects at the scene and that they further identified Keenan as the individual who had been in possession of a gun. The defense vigorously cross-examined each eyewitness with respect to the identification procedure that the police had used at the scene and the accuracy of the identifications. The jury was therefore presented with ample evidence from which it could evaluate the reliability of the identification testimony. "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."Manson at 116. In light of the detailed testimony that these witnesses had already provided regarding the identification, this Court cannot say that the trial court abused its discretion by prohibiting the officers' cross-examination on identification procedures in the abstract. Keenan's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
 "THE CONVICTIONS FOR FELONIOUS ASSAULT WITH FIREARM SPECIFICATIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 8} In his second assignment of error, Keenan argues that his convictions for felonious assault with firearm specifications are against the manifest weight of the evidence. This Court does not agree.
 {¶ 9} When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine *Page 5 
whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 10} Keenan was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which prohibits any person from "knowingly * * * [c]aus[ing] serious physical harm to another or to another's unborn[.]" Serious physical harm includes any physical harm that carries a substantial risk of death; involves permanent incapacity or disfigurement or temporary substantial capacity or disfigurement; or that involves "acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(e). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). As in his first assignment of error, Keenan's argument relates to identification: in short, he argues that the identification testimony offered by the State was unreliable and that he was not involved in the attack.
 {¶ 11} Jeremy Flynn testified that he left his job at Midway Mall shortly after 5:00 p.m. on December 11, 2005. As he walked to his car, which was parked near the access road that surrounds the mall parking lot, Flynn heard someone behind him yell, "That guy looks like your punk ass bitch brother." Flynn recalled that he continued walking without paying attention to the speaker because he assumed that it had nothing to do with him. Moments later, however, he heard someone behind him commenting on the brown jacket that he was wearing. According to Flynn's testimony, he turned around to find a young man, whom he did not recognize, pointing *Page 6 
in his direction. The man directed another epithet toward Flynn and moved in his direction. Flynn recognized that the man was not "coming at [him] to talk" and, with his car still twelve to fifteen spaces away, he dropped his belongings and prepared to defend himself.
 {¶ 12} Flynn testified that he and the man did not exchange any words, but threw two or three punches back-and-forth. Soon, however, Flynn noticed that others had joined the scuffle: "I felt more hands, or should I say, more blows to my body. So I started to cover. And about the time I started to cover the lights went out. * * * I woke up on the ground in a fetal position with my hands over my head." Flynn did not know how many people ultimately joined the fight, and he could only identify the person who came at him initially, an individual named Jeremy Vinovich. Flynn testified that he woke up with injuries to his head and torso and drove himself home with his cousin following behind, a decision that Flynn admitted to have been unwise. He went to the hospital shortly thereafter and was treated for a mild concussion, bruises and contusions on his chest and back, and a scratch on his ear. Flynn recalled that some time after the attack, when his pain medication wore off, he also discovered that he had two or three cracked teeth that required treatment.
 {¶ 13} Lee and Linda Grissinger were Christmas shopping at Midway Mall on December 11, 2005. Mr. Grissinger testified that he and his wife left the mall not long after 5:00 p.m. "and [came] upon four boys that were beating this young man up." As Mr. Grissinger approached with the intention of breaking up the fight, he saw one of the assailants hit the victim in the back of the head with an object in his right hand. Mr. Grissinger testified that he was twenty-five or thirty feet away from the fight at that point and that he heard a "thud" or a "crack" type of sound when the object made contact with the victim's head. Mr. Grissinger recalled that he yelled at the young men to "leave [the victim] alone" and continued to approach. As he did so, the man *Page 7 
who had hit the victim pulled a gun on him and replied, "back off f***er or I'll shoot you." Mr. Grissinger testified that his face was approximately one foot from the barrel of the gun, which he identified as a "black gun, automatic." As his wife called the police from her cellular phone, the men fled on foot. Mr. Grissinger stated that he was certain that the object in the man's hand was a weapon. He recalled that the gunman was taller than other participants in the fight, but of approximately the same height as himself. He explained that the gunman, however, stood on a slightly elevated piece of pavement relative to the others.
 {¶ 14} Mr. Grissinger testified that three police cruisers arrived in the mall parking lot, each carrying one man in the back seat. He recalled that the police "drove by and asked us if we recognized any of them. We recognized them all right off the bat. And I pointed to the one in the back seat of the car; that there was the boy that had the gun on me." Mr. Grissinger noted that it was the presence of a prominent scar on the gunman's lip that helped him to identify him at the scene. Mr. Grissinger emphasized that he was not told anything by the police before the identification, but did admit that he assumed the young men in the cruisers had been involved in the fight. He recalled that the police did not remove the men from the vehicles and line them up next to each other. He also recalled that although he assumed that they were wearing handcuffs, he did not see them. Mr. Grissinger identified Keenan in court as the gunman but, on cross-examination, acknowledged that he could see an indentation on Keenan's lip but not a scar.
 {¶ 15} Linda Grissinger also testified about the events that she witnessed on December 11, 2005. She recalled that as she and her husband approached the fight, one of the individuals "hit the victim in the head real hard with something. It sounded like it cracked. He went to the ground." She described the sound of the impact as "like they actually busted [the victim's] skull." Mrs. Grissinger testified that although she could not see an object in the man's hand *Page 8 
during the fight that she was certain the man who hit the victim pulled a gun on her husband moments later. She testified that the gunman did not have anything on his arm or in his hand except a black gun.
 {¶ 16} Mrs. Grissinger also described the identification of the assailants in the mall parking lot. She testified that the police arrived in the parking lot five or ten minutes after the fight and gave the eyewitnesses the opportunity to identify three young men who were seated in the back of police cruisers. She recalled that the police did not say anything to her before the identification other than, "Are these the guys? Could you identify them?" She acknowledged that she identified the gunman at the scene based on his facial characteristics and specifically noted "a severe situation * * * on his lip" that resembled a scar. Mrs. Grissinger identified Keenan in court as the gunman. She testified that she did not see anyone involved in the fight wearing a brace on his arm such as the one introduced into evidence as Defendant's Exhibit C, a black nylon arm brace secured with Velcro straps. She also testified that the sound she heard when the gunman struck Flynn was not the same sound made when Keenan's attorney struck a blow to an object with Exhibit C as a demonstration.
 {¶ 17} Robert LaRosa was sixteen years old on December 11, 2005, and was at Midway Mall "wasting time walking around the mall getting some food." As he left the mall, he noted that four "kids" walked past, "yelling stuff towards him. LaRosa testified that he did not respond. As he approached his car, however, he heard "a bunch of yelling and ruckus behind [him]." LaRosa dropped his belongings and ran toward a fight which, he recalled, involved the same four individuals. He recalled that as he tried to break up the fight he "saw one of the kids and the older guy * * * kind of getting into it" and that the individual in question held a "dark" and "shiny" metal object that resembled a gun. When the police arrived in the parking lot, he *Page 9 
was asked whether he "remember[ed] which one had a gun" and he identified the gunman. During cross-examination, LaRosa acknowledged that he was not certain whether the object he saw could have been an arm brace but, when confronted with Exhibit C, was certain that the object "didn't look to be that black brace" because it was "not shiny."
 {¶ 18} Elicia Adams arrived at Midway Mall around 5:00 p.m. on December 11, 2005. As she stepped from her car, which was parked approximately ten spaces away from the mall entrance, she saw a man pointing a gun at a couple in the parking lot. Adams testified that there were three other men in the parking lot and that they, and the gunman, were all white males wearing black shirts. Adams followed in her car when the men fled on foot, ending up in the parking lot of a nearby Marc's grocery store. Her boyfriend called the police from the car while she ran inside Marc's to look for a police officer. Adams testified that she did not see a fight and that she was not asked to identify anyone after the incident.
 {¶ 19} Detective Brian Rado, who was employed as a patrol sergeant in the Elyria Police Department, responded to the Marc's parking lot in a marked police cruiser. Detective Rado testified that as he drove around the building three men ran towards him. He placed the men in handcuffs and detained them until backup arrived, then sent the men to Midway Mall with other officers for identification at the scene. Detective Rado testified that separating suspects into separate vehicles was a standard procedure intended to ensure "the integrity of the investigation." He did not return to Midway Mall with the other officers. Detective Rado acknowledged that police did not recover the gun used in the incident.
 {¶ 20} Officer Daniel Marsico responded to Midway Mall. He testified that Flynn had already left the scene when he arrived, but that he found Mr. and Mrs. Grissinger and Mr. LaRosa at the scene in Mr. Grissinger's truck. Officer Marsico recalled that he spoke to the *Page 10 
witnesses in general terms while they were seated together in the truck, but then spoke with them individually outside. He acknowledged that the witnesses were in "close proximity" to each other while they provided oral statements to him. Officer Marsico testified that he asked the witnesses if they would be willing to identify three individuals who had been located nearby, and he recalled the words he used to describe the identification process:
 "I said, `Okay, what I'd like you to do is I'd like you to take your time. Each car is going to drive by everyone standing near the sidewalk area by the north main entrance of the mall.' I said, `The cars are going to drive by. They're going to roll down the window. Take a look and see if you recognize anyone.'"
He recalled that, as the police cars drove past, each of the witnesses identified the men in turn. According to Officer Marsico, when the final car drove past, "almost immediately once the window was rolled down and they got a good view of the subject, they simultaneously said, `That's the one that had the gun.' * * * And they were quite sure about it."
 {¶ 21} Adam Vinovich testified on Keenan's behalf. He stated that on the day of the incident, he was at Midway Mall with his brother Jeremy and two friends: Keenan and one Nick Laurenti. According to Adam's testimony, he is the tallest of the four. He testified that Jeremy got into a fight with Flynn while Keenan and Laurenti stood off to one side; that he attempted to break up the fight; and that when he was unable to do so, he "clubbed the dude twice on his head" with a black cast that he wore on his injured left wrist. Adam insisted that he would not lie for Keenan, but also acknowledged inconsistencies between his testimony and two prior statements to police.
 {¶ 22} Having reviewed the evidence in this case, along with the reasonable inferences that can be drawn therefrom, this Court concludes that the jury did not lose its way when it convicted Keenan of felonious assault with a firearm specification. Eyewitnesses identified Keenan with certainty as the individual who pulled a gun on Mr. Grissinger. The same *Page 11 
eyewitnesses stated that the same man struck Flynn on the back of the head with an object that was similar in appearance to a gun. A fourth eyewitness confirmed that she saw a couple held at gunpoint in the parking lot of the mall. None of the eyewitnesses testified in a manner that is consistent with Adam Vinovich's version of the events, in which he struck Flynn over the head with the arm brace identified as Exhibit C.
 {¶ 23} Keenan's convictions for felonious assault with a firearm specification are not against the manifest weight of the evidence. His second assignment of error is overruled.
 III. {¶ 24} Keenan's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30. *Page 12 
Costs taxed to Appellant.
 SLABY, J. DICKINSON, J. CONCUR *Page 1